UNITED STATES of America, Appellee,

v.

Michael BARNETT, Defendant,
Appellant.

UNITED STATES of America, Appellee,

v.

Barry JORDAN, Defendant,
Appellant, (Two Cases).

Nos. 91–1890, 91–1891, 92–1778.

United States Court of Appeals,
First Circuit.

Heard Nov. 5, 1992.

Decided March 29, 1993.

Gayle C. Wintjen with whom McGuinness & Parlagreco, Boston, MA, was on brief, for appellant Michael Barnett.

George F. Gormley, Cambridge, MA, for appellant Barry Jordan.

Joseph M. Walker III, Asst. U.S. Atty., with whom A. John Pappalardo, U.S. Atty., Boston, MA, was on brief, for appellee.

Before BREYER, Chief Judge, CYR and BOUDIN, Circuit Judges.

CYR, Circuit Judge.

Appellants Michael Barnett and Barry Jordan were charged, in a three-count indictment, with conspiracy to manufacture and possess with intent to distribute methamphetamine in violation of 21 U.S.C. § 846, possession with intent to distribute methamphetamine in violation of 21 U.S.C. § 841(a)(1), and possession of a listed chemical in violation of 21 U.S.C. § 841(d)(1). Barnett was convicted on all three counts at trial; Jordan pleaded guilty to all three counts shortly after the commencement of trial. Each was sentenced to a thirty-year prison term and a ten-year term of supervised release. On appeal, Barnett raises several challenges to his conviction, and joins Jordan in contesting the drug-quantity finding made by the district court at sentencing. We affirm.

### I

### BACKGROUND

In March 1990, the United States Drug Enforcement Agency ("DEA") began investigating a suspected conspiracy to manufacture and distribute methamphetamine. Surveillance was initiated at three sites in the Scituate, Massachusetts area: the residences of each appellant and the residence of their codefendant, Timothy Fitzgerald.[1]

Approximately a year before the investigation began, a trailer storage company had delivered a forty-foot trailer to Fitzgerald's residence in Scituate. The employee who made the delivery later testified that the recipient of the trailer, known to him as "Tim," instructed that the trailer be placed as far back as possible into the woods located on the property. Barnett subsequently rented the trailer from Fitzgerald.

In early May, 1990, undercover DEA Agent John Kelly offered to sell Jordan hydriodic acid ostensibly stolen by Kelly.[2] At their meeting, Jordan explained that his "chemist" had enough pseudoephedrine to produce forty pounds (eighteen kilograms) of methamphetamine, but needed twenty pints of hydriodic acid for the manufacturing process. During their tape-recorded conversation, Jordan agreed to buy twenty pints of hydriodic acid, and to provide Kelly with four ounces of methamphetamine in return. Jordan assured Kelly that he would receive four "uncut" ounces, and suggested that Kelly could double the volume by diluting the pure methamphetamine with an equal amount of "cut," then sell the resulting eight ounces for $2,000 an ounce.

Jordan described the methamphetamine manufacturing process to Kelly, explaining that it took seven to eight days, and that his chemist produced ten pounds of methamphetamine in each batch. To allay Kelly's concern about the danger of a laboratory explosion, Jordan explained that his chemist had been manufacturing methamphetamine for ten years, and volunteered that he had assisted the chemist in preparing eight to ten batches one summer.[3]

As promised, on May 16, 1990, Kelly delivered two boxes containing twenty half-liter bottles (approximately twenty pints) of hydriodic acid to Jordan. A different DEA agent followed Jordan to Barnett's residence, where he observed Jordan and Barnett unloading two boxes from the trunk of Jordan's car.

The DEA conducted a series of aerial surveillance fly-overs during May 1990. A fly-over of the Fitzgerald residence on or about May 27 revealed an electrical power cord running from the main house to the

---

**1.** Fitzgerald was acquitted at trial.

**2.** Hydriodic acid, a listed chemical, is essential to methamphetamine production using the "ephedrine reduction process," which also requires either ephedrine or pseudoephedrine; red phosphorus may also be used as a purifying agent. To convert the methamphetamine into powder for distribution, it is dissolved into freon liquid, then bubbled in hydrogen chloride gas.

**3.** After pleading guilty during trial, Jordan submitted an affidavit in which he insisted that these statements were mere "puffing," intended to convince Kelly that he was willing and able to complete their transaction. The affidavit attests that Jordan knew nothing about the manufacture of methamphetamine, and that his only role in the enterprise was to obtain hydriodic acid in exchange for a small amount of money to support his heroin habit.

trailer. (The ephedrine reduction process requires a power source to heat the chemicals.)

Two subsequent fly-overs of the Fitzgerald residence were conducted using an infrared heat-detecting device which operates in either of two polarity modes: "white-hot" or "black-hot." When the device is in the white-hot mode, objects emitting heat appear white on an attached screen; in the black-hot mode, heat-emitting objects appear black. The device detected no heat emission from the trailer during a fly-over on May 28. On May 30, Massachusetts State Police Trooper Richard Welby, who had relatively little experience with the infrared equipment, conducted another fly-over. Welby, erroneously believing the device was in the white-hot mode, observed that the trailer appeared white on the screen, and concluded that it was emitting heat. Subsequent analysis revealed, however, that the device actually was in the black-hot mode during the May 30 fly-over, and the infrared images, properly interpreted, indicated that the trailer was emitting no detectable heat.

On the afternoon of May 30, a DEA agent followed Barnett to the Fitzgerald property. When Barnett disappeared down the driveway, the agent left his vehicle and surreptitiously followed on foot. The agent spotted the trailer and saw Barnett inside. The agent noticed several blue buckets, a white radiator, and two boxes in the rear of the trailer. As the agent watched, Barnett scraped the bottom of one of the blue buckets for approximately five minutes, then poured liquid into the bucket. Barnett left the trailer and entered the main house, returning with several paper towels with which he filtered the yellow slushy contents of the bucket, then poured the filtered substance into a gray painter's tray. Barnett made another trip to the main house, this time returning with clear plastic sandwich bags. He picked up the gray painter's tray, rocked it back and forth several times, then poured the yellow slushy substance into one of the bags, double-bagged it, and returned once again to the main house.

The DEA agent returned to his vehicle, and waited for Barnett to drive away. After about twenty-five minutes, Barnett left the Fitzgerald property and drove to a shopping center, unaware that he was being followed by the agent. When the agent pulled into the shopping center parking lot, he noticed a second individual in Barnett's vehicle. The agent identified the second individual as appellant Jordan.

On May 30, DEA Agent Lemon compiled the information obtained from the various surveillance operations (including the erroneous heat-imaging data interpretation) in an affidavit, which he attached to an application for a warrant to search the trailer on the Fitzgerald property, the Fitzgerald and Jordan residences, and a residence believed to be occupied by Barnett.

The investigation culminated early the next morning when the search warrants were executed. First, agents searched the Fitzgerald trailer, unveiling a partially assembled laboratory containing an array of chemicals, including hydriodic acid, acetone, freon, and hydrogen chloride gas, and an assortment of equipment associated with methamphetamine production, including a radiator, a fan, flasks, tubes, and a heater-timer. Three ounces of methamphetamine crystals and a bucket containing approximately one pound of methamphetamine crystals in two and one-half pounds of an acetone/freon solution were also discovered. Subsequent analysis determined that the methamphetamine found in the bucket was between 90 and 100 percent pure.

DEA agents arrested Jordan and Fitzgerald at their respective residences. At Jordan's residence, agents seized a small quantity of a mixture containing heroin and methamphetamine, as well as a valium tablet, several hypodermic needles, and several publications describing the methamphetamine manufacturing process. At Fitzgerald's residence, agents found a piece of paper listing the chemical ingredients needed to produce methamphetamine using the ephedrine reduction process ("the Fitzgerald chemical list").

Barnett no longer resided at the residence for which the fourth search warrant had been obtained. When DEA agents arrested Barnett at his new residence, he was advised of his *Miranda* rights and that the laboratory had been discovered at the Fitzgerald property. Agents searched Barnett's new residence,[4] and discovered a warehouse receipt. In response to a question from Agent Lemon about the receipt, Barnett revealed that the remaining equipment and chemicals were in a storage bin at the warehouse. A warrant was secured and the search of the storage bin uncovered approximately fifteen pounds of red phosphorous, a seventy-pound drum containing an unspecified quantity of hydriodic acid, a fifty-kilogram container of pseudoéphedrine slightly less than half full, and various other chemicals, glassware, cooking devices, protective gear and gloves.

At DEA headquarters, after determining that Barnett had been advised of his *Miranda* rights, DEA agent Boeri engaged Barnett in conversation about the methamphetamine operation. In response to Boeri's questions, Barnett admitted that he was the "chemist," indicated that he had experienced no difficulty obtaining chemicals, and explained that his methamphetamine was "ninety nine and one percent" pure as a consequence of the two "extra" manufacturing steps he performed.

Five days into their joint trial, Jordan pleaded guilty to all counts. Thereafter, the jury convicted Barnett, and acquitted Fitzgerald, on all counts.

## II

## DISCUSSION

### A. *Sentencing Issues*

Barnett and Jordan challenge the sentencing court's determination that each was responsible for twenty-nine kilograms

of pure methamphetamine. Jordan alone contests the court's drug purity ruling. We review for clear error, *see* 18 U.S.C. § 3742(e); *United States v. Panet–Collazo,* 960 F.2d 256, 262 (1st Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 220, 121 L.Ed.2d 158 (1992); *United States v. Weston,* 960 F.2d 212, 220 (1st Cir.1992), with a view to whether the factual findings made by the sentencing court were supported by a preponderance of the reliable information. *See, e.g., United States v. Rodriguez–Cardona,* 924 F.2d 1148, 1155 (1st Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 54, 116 L.Ed.2d 31 (1991); *United States v. Zuleta–Alvarez,* 922 F.2d 33, 37 (1st Cir. 1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2039, 114 L.Ed.2d 123 (1991).

### 1. Drug Quantity

■ The district court adopted the drug-quantity findings set out in the presentence reports ("PSRs").[5] Each PSR provided, in relevant part:

> In this offense, the defendant secured a 50 kilogram drum of pseudoephedrine which would make 29 kilograms of pure methamphetamine. There was every indication that they had the materials to produce this full amount. As such, the Drug Quantity Table under [s]ubsection (c), offenses involving at least 10 kilograms but less than 30 kilograms of pure methamphetamine provides for a base offense level of 40.

Appellants insist that the court overestimated the capacity of their drug manufacturing operation and that their sentences should have been based exclusively on the quantity of methamphetamine seized.

The sentencing guidelines direct that a defendant who is convicted of conspiring or attempting to commit any offense involving a controlled substance shall be assigned the same base offense level "as if the object of the conspiracy or attempt had been

---

**4.** Barnett contests the district court ruling that the warrantless search was consensual. *See infra* at pt. II.B.1.

**5.** Appellants mistakenly suggest that the court made no specific finding as to the quantity of drugs for which they were being held responsible. The court checked the box on the "State-

ment of Reasons" form attached to the judgment relating to each defendant, thereby clearly indicating that "[t]he court adopt[ed] the factual findings and guideline application in the presentence report." We therefore reject their Rule 32(c)(3)(D) claim.

completed." U.S.S.G. § 2D1.4. Further guidance is provided in an application note:

> Where there is no drug seizure *or the amount seized does not reflect the scale of the offense,* the sentencing judge shall approximate the quantity of the controlled substance. In making his determination, the judge may consider, for example, the price generally obtained for the controlled substance, financial or other records, similar transactions in controlled substances by the defendant, and *the size or capability of any laboratory involved.*

U.S.S.G. § 2D1.4, comment. (n. 2) (1991) (emphasis added).

Three ounces of methamphetamine crystals, and a bucket containing an additional pound of methamphetamine crystals in two and one-half pounds of liquid, were seized. Nevertheless, the district court reasonably concluded that the quantity of methamphetamine seized did not accurately reflect the scale of the offense, *see id.,* especially in view of Jordan's admissions that his "chemist" had at hand the ingredients with which to produce forty pounds of methamphetamine, and in view of the equipment found in the trailer and storage facility, and the sizable quantities of precursor chemicals seized. Accordingly, under the sentencing guidelines the district court did not err in estimating the drug quantity.

The court based its drug-quantity calculation on the amount of methamphetamine producible with fifty kilograms of pseudoephedrine. Barnett and Jordan object to this calculation because it disregards the undisputed fact that the fifty-kilogram drum contained only twenty-three kilograms of pseudoephedrine when it was seized. Moreover, Jordan insists that the court's approximation of the quantity of methamphetamine was flawed because other essential precursor chemicals were not seized in the quantities required to produce twenty-nine kilograms of methamphetamine, in particular hydriodic acid.

In approximating the producible quantity of controlled substance, the sentencing court may consider the amount of precursor chemicals possessed. *See, e.g.,*

*United States v. Beshore,* 961 F.2d 1380, 1383–84 (8th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 241, 243, 121 L.Ed.2d 175, 177 (1992); *United States v. Short,* 947 F.2d 1445, 1456–58 (10th Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 1680, 118 L.Ed.2d 397 (1992); *United States v. Aichele,* 941 F.2d 761, 766 (9th Cir.1991); *United States v. Macklin,* 927 F.2d 1272, 1281 (2nd Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 146, 116 L.Ed.2d 112 (1991); *United States v. Kingston,* 922 F.2d 1234, 1236–38 (6th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 2054, 114 L.Ed.2d 460 (1991); *United States v. Smallwood,* 920 F.2d 1231, 1236–38 (5th Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 2870, 115 L.Ed.2d 1035 (1991). Although the sentencing court must " 'err on the side· of caution' " in selecting from among plausible alternative drug-quantity estimates, *United States v. Sklar,* 920 F.2d 107, 113 (1st Cir.1990) (quoting *United States v. Walton,* 908 F.2d 1289, 1301 (6th Cir.), *cert. denied,* 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990)), we cannot conclude that its approximation is constrained by the precursor-chemical quantities actually seized, *see Beshore,* 961 F.2d at 1383 (approximation of drug quantity "does not require that every precursor chemical be present"). Rather, U.S.S.G. § 2D1.4 expressly authorizes consideration of the *size or capability of any laboratory. See United States v. Havens,* 910 F.2d 703, 705 (10th Cir.1990), *cert. denied,* 498 U.S. 1030, 111 S.Ct. 687, 112 L.Ed.2d 678 (1991) (explaining that a drug-quantity estimate "should be equal to the amount of drugs produceable if the precursor chemicals possessed by the defendant were combined with proportionate amounts of the missing ingredients including processing equipment"); *see also United States v. Bertrand,* 926 F.2d 838, 846 (9th Cir.1991) (finding no clear error in drug-quantity approximation based on capacity of methamphetamine lab, notwithstanding lack of hydriodic acid); *Smallwood,* 920 F.2d at 1237 (upholding drug-quantity finding notwithstanding absence of precursor chemicals); *cf. United States v. Gerante,* 891 F.2d 364, 368–70 (1st Cir.1989) (basing approximation

of drug quantity on discovery at defendant's residence of $68,000 believed to be proceeds from recent drug sale). As we see it, the quantity of essential precursor chemicals seized, like the capacity of the laboratory and the evidence relating to the overall scheme, see *Smallwood*, 920 F.2d at 1237–38, is but one among several circumstantial factors appropriately considered in approximating drug quantities for sentencing purposes.

■ We must determine whether the government presented sufficient reliable information to permit the court reasonably to conclude that appellants were responsible for a quantity of drugs at least equal to the quantity threshold for the assigned base offense level. *See Sklar*, 920 F.2d at 113. The base offense level assigned each appellant was 40, the level applicable to offenses involving between ten and thirty kilograms of unadulterated methamphetamine. A DEA chemist testified at trial that fifty kilograms of pseudoephedrine would yield twenty-nine kilograms of methamphetamine.[6] Utilizing the same ratio—one unit of pseudoephedrine per a .58 unit of methamphetamine—the twenty-three kilograms of pseudoephedrine seized in the fifty-kilogram drum would yield approximately thirteen kilograms of methamphetamine, a quantity sufficient to warrant the base offense level of 40.

The DEA chemist further testified that the ephedrine reduction process requires hydriodic acid in quantities from one to four times the amount of pseudoephedrine, depending upon the particular "recipe." Although the evidence does not establish the exact amount of hydriodic acid the defendants possessed, approximately ten liters were seized, along with an unspecified quantity found in a seventy-pound container at the warehouse. In addition, an empty seventy-pound hydriodic acid container was found at the trailer.

Furthermore, Jordan admitted to Agent Kelly that he and the "chemist" had all the necessary ingredients, with the exception of the hydriodic acid being procured from Kelly, with which to manufacture forty pounds (eighteen kilograms) of methamphetamine immediately. The court also had before it the Fitzgerald chemical list, reflecting chemical quantities sufficient to produce at least twenty-nine kilograms of methamphetamine. Some quantity of each chemical on the list was seized either from the trailer or the warehouse and in the size container specified on the list.[7] Appellants' PSRs also contain the uncontroverted statements that Barnett produced approximately eight pounds of methamphetamine in December 1989 and that Jordan participated in its distribution. Neither appellant presented countervailing drug-quantity or chemical-quantity evidence at sentencing.

We discern no clear error. The district court had before it sufficient reliable information to support a finding that Barnett and Jordan were actually responsible for

---

6. Jordan points out that the court did not state that it was relying on the DEA chemist's testimony, that the drug quantity approximation in the PSR is not attributed to the chemist, and that Jordan had no opportunity to cross-examine the chemist, who testified after Jordan had entered his guilty plea.

"A sentencing hearing need not meet all the procedural safeguards and strict evidentiary limitations of a criminal trial." *Zuleta–Alvarez*, 922 F.2d at 36. The sentencing court may rely on extrinsic evidence which was not subjected to cross-examination, so long as there are " 'sufficient indicia of reliability to support its probable accuracy.' " *Id.* at 36 (quoting U.S.S.G. § 6A1.3). Jordan failed to present any evidence at sentencing to refute the drug-quantity approximation in the PSR. We discern no clear error in the sentencing court's reliance on the DEA chemist's trial testimony.

7. The Fitzgerald chemical list reads as follows:
d-pseudoephedrine Hcl.
.50 kilo drum
Hydriodic Acid
4—70 lb drum
Red Phosphorus
15 lb
R–II Freon
7—100 lb drums
Methyl Alchohol [sic] (methanol)
5—5 gal drums
Acetone
7—5 gal drums

Among the seized chemicals were a partially filled fifty-kilogram drum of pseudoephedrine, one empty and one partially filled seventy-pound hydriodic acid drum, several one-pound bottles of red phosphorus, a 100–pound drum of freon, several five-gallon containers of methanol, and two five-gallon acetone containers.

*not less* than ten kilograms of methamphetamine, warranting a base offense level of 40.

### 2. Drug Purity

An explanatory note appended to the Drug Quantity Table distinguishes between the terms "methamphetamine (actual)" and "methamphetamine":

> Unless otherwise specified, the weight of a controlled substance set forth in the table refers to the entire weight of any mixture or substance containing a detectable amount of the controlled substance.... The term[ ] ... "[m]ethamphetamine (actual)" refer[s] to the weight of the controlled substance, itself, contained in the mixture or substance.

U.S.S.G. § 2D1.1(c). The table prescribes a base offense level of 40 for offenses involving between ten and thirty kilograms of "methamphetamine (actual)," whereas the same quantity of adulterated "methamphetamine" carries a base offense level of 36. Now, for the first time, Jordan argues that the record does not establish the purity of the methamphetamine for which he was held responsible, and that his base offense level should have been computed under the Drug Quantity Table entry for adulterated "methamphetamine" rather than "methamphetamine (actual)."

 Issues not squarely raised in the district court will not be entertained on appeal. *See United States v. Haggert,* 980 F.2d 8, 10–11 (1st Cir.1992) (collecting cases). Although defense counsel consistently referred to base offense levels corresponding to adulterated "methamphetamine" rather than "methamphetamine (actual)," both at sentencing and in opposition to the PSR, at no time did he expressly raise drug purity as an issue in the district court. "Judges are not expected to be mindreaders. Consequently, a litigant has an obligation to spell out [his] arguments squarely and distinctly, or else forever hold [his] peace." *United States v. Zannino,* 895 F.2d 1, 17 (1st Cir.) (internal citations and quotation marks omitted), *cert. denied,* 494 U.S. 1082, 110 S.Ct. 1814, 108 L.Ed.2d 944 (1990). The drug-purity claim must be deemed waived, as it was never raised below.[8]

### B. *Suppression Issues*

#### 1. The Consensual Search

 Barnett filed a pretrial motion to suppress certain physical evidence and admissions, on the ground that he did not voluntarily consent to the warrantless search of his residence. The district court disagreed. We review for clear error. *United States v. Wilkinson,* 926 F.2d 22, 24 (1st Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 2813, 115 L.Ed.2d 985 (1991); *United States v. Twomey,* 884 F.2d 46, 51–52 (1st Cir.1989), *cert. denied,* 496 U.S. 908, 110 S.Ct. 2592, 110 L.Ed.2d 273 (1990). A warrantless residential search violates the Fourth Amendment unless it comes within one of the " 'few specifically established and well-delineated exceptions[,]' " *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973) (quoting *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967)), which include consensual searches, *id.* 412 U.S. at 219, 228, 93 S.Ct. at 2043, 2048. The voluntariness of a consent to search turns on an assessment of

---

**8.** The raise-or-waive rule will be relaxed only in exceptional cases involving a gross miscarriage of justice where the belated claim is " 'so compelling as virtually to insure appellant's success.' " *Johnston v. Holiday Inns, Inc.,* 595 F.2d 890, 894 (1st Cir.1979) (quoting *Dobb v. Baker,* 505 F.2d 1041, 1044 (1st Cir.1974)); *see United States v. Slade,* 980 F.2d 27, 31 (1st Cir.1992); *Haggert,* 980 F.2d at 10–11; *Hernandez–Hernandez v. United States,* 904 F.2d 758, 763 (1st Cir.1990). This narrow exception is unavailing in the present case.

The sentencing court had before it evidence that Barnett performed extra manufacturing steps to assure maximum purity, that Jordan promised to deliver "uncut" methamphetamine to Agent Kelly, that Barnett boasted to Agent Boeri that his methamphetamine had been analyzed "ninety-nine and one hundred percent" pure, and that the methamphetamine seized at the trailer was between ninety and one hundred percent pure. Absent any evidence that the methamphetamine was diluted or adulterated in any manner, the sentencing court was presented with insufficient evidence to sustain Jordan's present drug-purity claim.

the totality of the circumstances. *United States v. Mendenhall,* 446 U.S. 544, 557, 100 S.Ct. 1870, 1878–79, 64 L.Ed.2d 497 (1980); *Schneckloth,* 412 U.S. at 227, 93 S.Ct. at 2048. Among the individualized factors bearing on the vulnerability of the consenting party are age, education, experience, intelligence, and knowledge of the right to withhold consent. More general considerations include whether the consenting party was advised of his or her constitutional rights and whether permission to search was obtained by coercive means or under inherently coercive circumstances. *Id.* at 226, 93 S.Ct. at 2047; *Twomey,* 884 F.2d at 51. Although sensitivity to the heightened possibility of coercion is appropriate when a defendant's consent is obtained during custody, *see Schneckloth,* 412 U.S. at 240, n. 29, 93 S.Ct. at 2055, n. 29, "custody alone has never been enough in itself to demonstrate ... coerced ... consent to search." *United States v. Watson,* 423 U.S. 411, 424, 96 S.Ct. 820, 828, 46 L.Ed.2d 598 (1976).

Barnett argues that his consent was coerced, in that he was met at the door of his home by seven or eight law enforcement officers, with guns drawn. Immediately after he was arrested and handcuffed, the officers holstered their weapons and advised Barnett of his *Miranda* rights. Barnett was then asked if he would consent to a search of the premises.[9] Barnett claims that he was never informed that he could withhold his consent, he was given no

consent form, and he was led to believe that the officers already had a search warrant because they began searching the premises immediately upon entering, prior to requesting consent.

▮ Written consent is not essential to the establishment of a valid consensual search. *See, e.g., United States v. Chaidez,* 906 F.2d 377, 382 (8th Cir.1990) (search may be justified by voluntary oral consent even in the absence of valid written consent); *United States v. Castillo,* 866 F.2d 1071, 1082 (9th Cir.1988) (defendant's refusal to sign a consent form does not preclude a finding of voluntariness). Moreover, it is not essential that the officers first inform the consenting party of the right to withhold consent, though knowledge of the right to withhold consent is a factor to be considered in assessing voluntariness, *Schneckloth,* 412 U.S. at 227, 93 S.Ct. at 2048; *see also Florida v. Rodriguez,* 469 U.S. 1, 6–7, 105 S.Ct. 308, 311, 83 L.Ed.2d 165 (1984).

▮ Although Barnett testified that agents began "searching, looking under things," and "opening drawers and cabinets," Lemon testified that a *protective sweep* was conducted immediately upon entering the premises to ensure that no one else was present.[10] Thereafter, according to Lemon, the agents "just [stood] around" until Barnett consented to a further search. We find no clear error in the trial court's credibility-based ruling that "a sweep search was conducted."

---

**9.** Barnett testified that, following his arrest, he was told by Agent Lemon: "Mike, we are just going to look around and take you down to the Marshfield Police Station, okay?" Barnett replied, "Okay." Barnett contends that he was merely acknowledging his arrest and inevitable booking, not consenting to a search of his residence. Based on Agent Lemon's testimony, however, the court found that Barnett was asked: "Mind if I look around the house?" and responded, "Go ahead. You'd probably get a search warrant anyway." The district court was presented with a pure credibility determination. We find no clear error in its determination that

Lemon's version of the events was more credible.

**10.** A sweep search is "narrowly confined to a cursory visual inspection of those places in which a person might be hiding," *Maryland v. Buie,* 494 U.S. 325, 327, 110 S.Ct. 1093, 1094–95, 108 L.Ed.2d 276 (1990). The officers are permitted to take reasonable steps to ensure their safety, and may, "without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Id.*

Barnett's contention that the search conducted immediately upon entry led him to believe that the agents already had a search warrant cannot succeed in any event. The district court expressly found that Barnett responded as follows to Lemon's request for consent to search: "Go ahead. You'd probably get a *search warrant anyway*[ ]" (emphasis added), plainly implying Barnett's understanding that the agents had no search warrant and needed his consent.

Notwithstanding the inherently unnerving effect of having numerous officers arrive at one's door with guns drawn, Barnett was no "newcomer" to law-enforcement encounters. *See United States v. Kimball*, 741 F.2d 471, 474 (1st Cir.1984). Barnett had been convicted of at least eighteen prior offenses and arrested on at least eight previous occasions. Thus, we may fairly presume that he was "less likely than most to be intimidated by the agents' show of force." *United States v. Cepulonis*, 530 F.2d 238, 244 (1st Cir.), *cert. denied*, 426 U.S. 908, 96 S.Ct. 2231, 48 L.Ed.2d 834, and *cert. denied*, 426 U.S. 922, 96 S.Ct. 2630, 49 L.Ed.2d 376 (1976). In addition, before he was asked to consent to the search, all guns had been holstered and Barnett was advised of his *Miranda* rights, " 'put[ting] him on notice that he [could] refuse to cooperate,' " *id.* (quoting *Gorman v. United States*, 380 F.2d 158, 164 (1st Cir.1967)). Finally, there was no evidence of overt or covert threats or pressure to exact Barnett's consent.

In these circumstances, we conclude that Barnett's will was not overborne, nor his "capacity for self-determination critically impaired." *Schneckloth*, 412 U.S. at 225, 93 S.Ct. at 2046–47. Ultimately, as we are not " 'left with the definite and firm conviction that a mistake has been committed,' " *Anderson v. Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)), we find no clear error in the trial court's determination that Barnett's consent was voluntary.

### 2. The Lemon Affidavit

Next, Barnett claims that the district court erred in refusing to suppress evidence obtained as a result of alleged false statements in the affidavit supporting the search warrant application. Barnett contends that the erroneous heat-imaging test data in the Lemon affidavit was materially false or included with reckless disregard for its truth. Without it, says Barnett, the Lemon affidavit was insufficient to establish probable cause to search the trailer.

The district court conducted an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). *Franks* findings are reviewed for clear error. *United States v. Cole*, 807 F.2d 262, 268 (1st Cir.1986), *cert. denied*, 481 U.S. 1069, 107 S.Ct. 2461, 95 L.Ed.2d 870 (1987). The questions for us are (1) whether Barnett established by a preponderance of the evidence at the *Franks* hearing that the affidavit was perjurious, or prepared with reckless disregard for its truth, *and* (2) whether the affidavit, without the false material, was insufficient to establish probable cause for the search. If so, the warrant was void and the fruits of the search must be suppressed. *Franks*, 438 U.S. at 155–56, 98 S.Ct. at 2676.

Barnett claims that the heat-imaging data Trooper Welby provided to Lemon, *see supra* at pp. 549–50, was either deliberately or recklessly false, because Welby failed to inform Lemon that he lacked training and experience in operating the device and failed to examine the device prior to the May 30 flyover to determine which polarity mode was operative.

The district court finding that Welby did not act in bad faith was not clearly erroneous. There is no evidence that Welby intentionally misinterpreted the data from the infrared equipment. Rather, the evidence strongly suggests, just as the court found, that Welby sincerely believed, albeit mistakenly, that the equipment was in the "white-hot" polarity mode during the flyover.

Neither is there evidence that Lemon knew that the heat-imaging data was incor-

rect. Nevertheless, Barnett argues that Lemon's failure to make note, in the affidavit, that Welby had little experience with the heat-imaging equipment was a material omission made intentionally or with reckless disregard for the truth. Although the district court made no direct finding on this issue, we need not pursue the matter as the affidavit would have been sufficient without the challenged data.

> "[I]f an affiant knowingly includes a false statement in a warrant affidavit, the warrant will stand if, 'when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause.'"

*United States v. Veillette*, 778 F.2d 899, 904 (1st Cir.1985), *cert. denied*, 476 U.S. 1115, 106 S.Ct. 1970, 90 L.Ed.2d 654 (1986) (quoting *Franks*, 438 U.S. at 171–72, 98 S.Ct. at 2684).

■ The Fourth Amendment warrant requirement is met if the magistrate had a "'substantial basis for ... conclud[ing]' that a search would uncover evidence of wrongdoing." *Illinois v. Gates*, 462 U.S. 213, 236, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527 (1983) (quoting *Jones v. United States*, 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960)). Without regard to the incorrect heat-imaging data, the Lemon affidavit established probable cause to search the trailer.[11] The suppression ruling was not clearly erroneous.

### C. *Severance*

Next, Barnett claims that denial of his severance motion violated his Sixth Amendment right to confrontation, as a consequence of the prejudice occasioned by the admission in evidence, at the joint trial, of codefendant Fitzgerald's post-arrest statements, *see Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), and that he was further prejudiced by the testimony of Fitzgerald's spouse, Sheryl.

At trial, Agent Lemon testified as follows:

> I advised Mr. Fitzgerald that we had done a search on the trailer in his backyard. I advised Mr. Fitzgerald that we had found a speed lab, a methamphetamine lab. I told him that I believed another person was the chemist, and I also told Mr. Fitzgerald that I believed he knew who the other person was and that this other person was a chemist.... He told me he knew who this other person was, but that he did not know that this person was involved with a clandestine laboratory. He stated that he knew him or this other person socially and that he would go out on occasion and have a few drinks with this other person....

11. We summarize some of the more salient information in the affidavit:

(1) In March 1990, a cooperating individual informed Lemon that Barry Jordan and a man known as "Barney" were manufacturing methamphetamine in the South Shore area, possibly in Scituate. According to the informant, Jordan and "Barney" manufactured ten pounds of methamphetamine in November or December of 1989.

(2) Jordan told DEA undercover agent Kelly that he and his chemist had 160 pounds of chemicals, and needed only hydriodic acid to manufacture forty pounds of methamphetamine. Kelly supplied the hydriodic acid in exchange for Jordan's promise to give Kelly four ounces of methamphetamine.

(3) Clandestine methamphetamine labs typically have air vents or ducts to dissipate toxic fumes; photographs of the trailer revealed a "black bordered area" which Lemon, based on his experience, believed to be a trapdoor or venting area for a clandestine laboratory inside the trailer.

(4) The pattern of electricity consumption suggested the presence of a clandestine lab. The electricity bills showed a dramatic increase in December 1989, the time period during which Jordan and "Barney" manufactured ten pounds of methamphetamine.

(5) During a DEA flyover on May 26, 1990, a DEA agent first observed a power cord running between the trailer and the main house. During a May 28 flyover, two Massachusetts State Troopers observed the same cord.

(6) A DEA agent observed Barnett mixing and straining a "yellow, slushy mixture" at the trailer on May 30.

(7) The trailer was located in a remote, wooded location, an ideal site for a clandestine laboratory.

Mr. Fitzgerald told me that he rented the trailer out to this other person and that it was used for construction.... Mr. Fitzgerald told me that he ... did not know what was going on out in the trailer, and I then asked Mr. Fitzgerald how he could explain the hydrio[d]ic acid label that was found in his coat, and what Mr. Fitzgerald told me was that he was in the trailer, he saw the bottles of hydrio[d]ic acid, and that he removed one of the labels because he wanted to find out what it was.

Barnett objected and moved to strike on *Bruton* grounds.[12] The court sustained the Barnett objection, but allowed the testimony to stand against Fitzgerald. No limiting instruction was requested, offered or given.

■■■■■ There was no confrontation clause violation. First, insofar as the Lemon testimony related the extrajudicial statements *Lemon* made to Fitzgerald about "the chemist," no *Bruton* problem was presented and no hearsay objection was made.[13] Even *Fitzgerald's* extrajudicial

statements to Lemon neither identified nor inculpated Barnett, but merely related factual observations established by other independent evidence. Second, assuming the jury did deduce, as seems likely, that Lemon and Fitzgerald were referring to Barnett, Fitzgerald's statements nonetheless did not entail the sort of " 'powerfully incriminating' effect of one accomplice pointing the finger directly at another, without subjecting himself to cross-examination." *United States v. DiGregorio*, 605 F.2d 1184, 1190 (1st Cir.), *cert. denied*, 444 U.S. 937, 944, 983, 100 S.Ct. 287, 302, 489, 62 L.Ed.2d 197, 312, 411 (1979) (quoting *Bruton*, 391 U.S. at 135, 88 S.Ct. at 1627). *See also United States v. Greenleaf*, 692 F.2d 182, 188–89 (1st Cir.1982), *cert. denied*, 460 U.S. 1069, 103 S.Ct. 1522, 1523, 75 L.Ed.2d 946 (1983) (finding no *Bruton* violation where codefendant's statement was not "powerfully incriminating."). Not only did Fitzgerald not *confess* guilt, he in no manner admitted to knowledge of *Barnett's* guilt. Thus, Fitzgerald's admissions to Lemon inculpated neither Barnett nor Fitzgerald.[14]

---

**12.** At sidebar, the following exchange occurred:

THE COURT: How is this based under the *Bruton* issue?

MR. HORAN: I would still contend that all along [for Barnett]: the statement was sanitized so to speak, but the implication is still clear by the Government that the person who is being talked about here is Michael Barnett.

THE COURT: Let's assume it is. He [Fitzgerald] is not confessing to anything. He's a fact witness.

MR. KENDALL: He will. What the Government would [AUSA] agree to is the statement will not be admitted—against Barnett, or, conversely, it is only to Fitzgerald.

Barnett contends that the court's comment that Fitzgerald "was not confessing to anything" and was a mere "fact witness" is reversible error. This argument is baseless.

**13.** Although Barnett moved to strike the "entire conversation," he did so on *Bruton* grounds only. No separate objection was made to Lemon's testimony relating his own extrajudicial statements to Fitzgerald in the guise of reciting Lemon's investigative efforts.

**14.** Whatever prejudice might otherwise have resulted from the joint trial was minimized by precautions the district court took to forfend

against it. After the pretrial severance motion was denied, the government stipulated that any testimony relating post-arrest statements by Fitzgerald would not refer to Barnett by name and the district court firmly admonished against "any mention of [Barnett]" in connection with Fitzgerald's statements.

Barnett nevertheless maintains that the court committed reversible error by failing to instruct the jury that Fitzgerald's extrajudicial statements were not admissible against Barnett, even though Barnett did not request a limiting instruction, either at the time of the ruling or at the time of the final jury charge, and even though he did not object to the charge. The claim must be deemed waived, *United States v. Mateos–Sanchez*, 864 F.2d 232, 238 (1st Cir. 1988); *United States v. Rawwad*, 807 F.2d 294, 296 (1st Cir.1986), *cert. denied*, 482 U.S. 909, 107 S.Ct. 2490, 96 L.Ed.2d 382 (1987), especially since it seems highly likely that the trial court would have viewed it as a reasonable tactical decision for defense counsel to refrain from requesting an instruction recalling the jury's attention to Lemon's testimony. "We have been extremely reluctant 'to increase the heavy burdens already imposed on trial judges in criminal cases' by mandating that the district courts act *sua sponte* to override seemingly plausible stra-

Barnett submits that severance was warranted, nonetheless, to avoid the cumulative prejudice from Fitzgerald's extrajudicial statements and the testimony of Sheryl Fitzgerald.[15] The severance ruling is reviewable for abuse of discretion, reversible only if it " 'deprived defendant of a fair trial, resulting in a miscarriage of justice.' " *United States v. Tejeda,* 974 F.2d 210, 219 (1st Cir.1992) (quoting *United States v. McLaughlin,* 957 F.2d 12, 18 (1st Cir.1992)); *see also United States v. Martinez,* 922 F.2d 914, 922 (1st Cir.1991) (severance is committed to the sound discretion of the trial judge, reversible only on a showing of manifest abuse). While incidental prejudice is sometimes unavoidable in a joint trial, only a strong showing of substantial prejudice will warrant reversal. *McLaughlin,* 957 F.2d at 18.

The "heavy burden" of demonstrating the unfair prejudice required for reversal has not been met. *See United States v. Perkins,* 926 F.2d 1271, 1280 (1st Cir.1991). First, the record does not disclose that this issue was preserved at trial, as Barnett neither objected to Sheryl Fitzgerald's testimony, nor requested a limiting or cautionary instruction. Second, Barnett identifies no basis for excluding her testimony, either at a joint trial or a separate trial. Thus, although her testimony inculpated Barnett, there was no unfair prejudice.

### D. *Criminal Rule 35*

Barnett appeals from the dismissal of his motion to correct sentence pursuant to Fed. R.Crim.P. 35(a), which sought a downward departure due to diminished mental capacity.[16] The district court dismissed on the ground that it lacked the power to grant relief under Rule 35(a).

Rule 35(a) [17] expressly empowers a district court to correct a sentence only on remand from the court of appeals. *United States v. Carr,* 932 F.2d 67, 69 (1st Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 112, 116 L.Ed.2d 82 (1991). Rule 35(c), which permits the sentencing court to correct a

---

tegic choices on the part of counselled defendants." *United States v. De La Cruz,* 902 F.2d 121, 124 (1st Cir.1990) (quoting *United States v. Reveron Martinez,* 836 F.2d 684, 687 (1st Cir. 1988)). Furthermore, we are confident that there was no plain error. The absence of a limiting instruction did not "seriously affect the fundamental fairness and basic integrity of the proceedings," *United States v. Griffin,* 818 F.2d 97, 100 (1st Cir.), *cert. denied,* 484 U.S. 844, 108 S.Ct. 137, 98 L.Ed.2d 94 (1987).

**15.** Barnett identifies two aspects of Sheryl Fitzgerald's testimony as especially prejudicial: (1) that Barnett entered the Fitzgerald house several times on May 30, leaving with clear plastic sandwich bags in his possession on one occasion; and (2) that, after Barnett left on the evening of May 30, she found a piece of paper bearing handwriting different than her husband's, and gave it to her husband to deliver to Barnett. Barnett does not mention, in this connection, some of Sheryl Fitzgerald's other testimony. For example, she testified that she rented the trailer to Barnett.

**16.** Barnett claims that he suffers from short-term memory loss. Mental and emotional conditions generally are not grounds for downward departure. U.S.S.G. § 5H1.3. *See United States v. Lauzon,* 938 F.2d 326, 333 (1st Cir.), *cert.*

denied, — U.S. —, 112 S.Ct. 450, 116 L.Ed.2d 468 (1991); *United States v. Studley,* 907 F.2d 254, 257 (1st Cir.1990). Nevertheless, a guideline policy statement provides as follows:

> If the defendant committed a non-violent offense while suffering from significantly reduced mental capacity not resulting from voluntary use of drugs or other intoxicants, a lower sentence may be warranted to reflect the extent to which reduced mental capacity contributed to the commission of the offense, provided that the defendant's criminal history does not indicate a need for incarceration to protect the public.
> U.S.S.G. § 5K2.13.

**17.** Federal Rule of Criminal Procedure 35(a) provides:

> The court shall correct a sentence that is determined *on appeal* under 18 U.S.C. 3742 to have been imposed in violation of law, to have been imposed as a result of an incorrect application of the sentencing guidelines, or to be unreasonable, *upon remand* of the case to the court—
> (1) for imposition of a sentence in accord with the findings of the court of appeals; or
> (2) for further sentencing proceedings if, after such proceedings, the court determines that the original sentence was incorrect.
> Fed.R.Crim.P. 35(a) (emphasis added).

sentence imposed as a result of arithmetical, technical, or other clear error, was not in effect either when the Barnett motion was filed or dismissed. Moreover, in this case we need not consider whether the district court had the inherent power to correct *obvious sentencing errors, see United States v. Rico,* 902 F.2d 1065, 1067–68 (2d Cir.), *cert. denied,* 498 U.S. 943, 111 S.Ct. 352, 112 L.Ed.2d 316 (1990); *United States v. Cook,* 890 F.2d 672, 674–75 (4th Cir.1989); *see also Carr,* 932 F.2d at 70–71, since there were none. As the sentence imposed on Barnett was in no respect unlawful or unreasonable, the motion to reconsider was properly dismissed.

### E. *Outrageous Government Conduct*

 Barnett claims that the indictment should have been dismissed on due process grounds, since Agent Kelly's sale of hydriodic acid to Jordan constituted outrageous government conduct. Law enforcement conduct violates the Due Process Clause of the Fifth Amendment if it results in a denial of " 'fundamental fairness, shocking to the universal sense of justice.' " *United States v. Russell,* 411 U.S. 423, 432, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973) (quoting *Kinsella v. United States ex rel. Singleton,* 361 U.S. 234, 246, 80 S.Ct. 297, 303, 4 L.Ed.2d 268 (1960)). *See also United States v. Panitz,* 907 F.2d 1267, 1272 (1st Cir.1990) ("The Supreme Court has not foreclosed the possibility that the government's active participation in a criminal venture may be of so shocking a nature as to violate a defendant's right to due process, notwithstanding the defendant's predisposition to commit the crime"). We find no due process violation.

Because drug conspiracies are notoriously difficult to penetrate, courts consistently have allowed greater government involvement in drug-crime investigations. *Panitz,* 907 F.2d at 1273. Law enforcement infil-

tration of drug rings, and even limited investigative participation in their unlawful operations, do not constitute outrageous government conduct violative of due process. *Russell,* 411 U.S. at 432, 93 S.Ct. at 1643.

 Although Agent Kelly sold Jordan a precursor chemical which is an integral methamphetamine component, the government was neither the conspirators' sole source (hydriodic acid obtained from other sources was seized in the warehouse search), nor did the government initiate the criminal conduct. Jordan told Agent Kelly that Barnett had been producing methamphetamine for ten years. Other evidence revealed that Jordan and Barnett had manufactured eight to ten pounds of methamphetamine in 1989. The sale of hydriodic acid to Jordan in these circumstances was a permissible investigative effort to infiltrate the suspected drug-related conspiracy. The district court properly denied the motion to dismiss on due process grounds.

### F. *Cumulative Error*

Finally, as most assignments of error were baseless, we reject Barnett's contention that the cumulative effect of the many errors he alleges required reversal on due process grounds. We are well satisfied that Barnett received due process: "[T]he Constitution entitles a criminal defendant to a fair trial, not a perfect one." *Delaware v. Van Arsdall,* 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986).

*The sentence of appellant Jordan and the conviction and sentence of appellant Barnett are affirmed.*