**UNITED STATES of America**

v.

**Donald J. REITH, Defendant.**

**No. CR. 99–20–B.**

United States District Court,
D. Maine.

Aug. 16, 1999.

Michael D. Love, Asst. U.S. Atty., Bangor, ME, for U.S.

Perry H. O'Brian, Bangor, ME, for Defendant Reith.

### ORDER AND MEMORANDUM OF DECISION

BRODY, District Judge.

In an indictment filed April 13, 1999, the United States of America ("the Government") alleges that Defendant Donald J. Reith ("Defendant") possessed an unregistered firearm in violation of 26 U.S.C. §§ 5861(d) and 5871. Before the Court is Defendant's Motion to Suppress statements and evidence obtained in connection with his arrest on this charge. For the reasons stated below, Defendant's Motion is GRANTED IN PART and DENIED IN PART.

### I. BACKGROUND

As the parties acknowledged at the hearing on this matter, the relevant facts are undisputed.

At approximately 5:00 P.M. on April 1, 1999, Defendant's wife, Dana Reith ("Dana"), fled to the Daryl Wells Fire Station in Augusta, Maine after being beaten in her home by Defendant. Upon arriving at the Fire Station, Dana told

firefighter Charles Squires ("Squires") that Defendant had a sawed-off shotgun.

Shortly thereafter, Augusta Police Department Sergeant Keith Brann ("Brann") and Officer Richard DuBois ("DuBois") arrived at the Fire Station in response to a report of the incident. While DuBois interviewed Dana, Squires told Brann about the shotgun. Brann then questioned Dana and she told him that Defendant had a sawed-off shotgun that he kept in a dresser drawer in their bedroom. DuBois asked Dana if she would show him the shotgun after the officers were through investigating the assault and Reith agreed.

DuBois and Brann next went to speak to Defendant, who by then was standing outside the Fire Station. As they approached Defendant, DuBois asked him what had happened and Defendant made incriminating statements concerning the assault on his wife. Following these admissions, DuBois and Brann arrested Defendant for domestic assault and placed him in handcuffs.

Following Defendant's arrest, DuBois asked him general questions about whether he had a gun. Defendant answered affirmatively and DuBois asked him what kind of gun it was. Defendant replied that the gun was illegal. When DuBois asked what he meant, Defendant said that he had bought a shotgun and cut off the barrel. DuBois then asked Defendant whether Defendant would show him the shotgun. Defendant agreed and led DuBois and Brann into the bedroom of his apartment where he pointed out a briefcase and stated that it contained the shotgun. The briefcase was locked and Defendant told the officers the combination. As they opened the briefcase, Defendant warned them that they should be careful because the gun was loaded. The briefcase, in fact, did contain a loaded, sawed-off shotgun that the officers seized along with the briefcase. DuBois asked Defendant where the shotgun's barrel was and Defendant replied that he had thrown it out in the trash. DuBois then transported Defendant to the

Augusta Police Station by DuBois. At no time up to this point was Defendant advised of his Miranda rights.

Dana was transported separately to the Augusta Police Station. In interviews with Maine State Police Special Agent Kenneth MacMaster ("MacMaster") and Bureau of Alcohol, Tobacco, and Firearms Special Agent Brent McSweyn ("McSweyn"), she conveyed substantially the same information she had shared with DuBois and Bann. MacMaster requested that Dana consent to a search of the couples' apartment, advising her that she could refuse to consent and that if she did, he would seek a search warrant from a judge. Dana executed a written consent to search the apartment a short time later.

MacMaster, McSweyn, and DuBois then conducted a taped meeting with Defendant at the Augusta Police Station. At the start of the meeting, McSweyn informed Defendant of his Miranda rights. The interview then featured the following exchange:

BM: Good. Good. Very good. Um, there came a time the police came? And found you outside?

DR: Yes, I was waiting for them.

BM: You were waiting for them?

DR: Yes.

BM: What happened when they came up and saw you outside?

DR: Well, they just, ah, ah, ah, followed their procedures, you know, I understand that day [inaudible], they had me in a position for arrest and stuff.

BM: Okay.

DR: That's all it was. I cooperated with them, you know. I respect law enforcement. I just got out of hand right there, and, ah, I was, I wanted to go freely, 'cause, I just, I didn't want any more trouble, I just.

BM: All right.

DR: I was wrong and

BM: Did they ask you about a gun?

DR: Yes, they did. Yes, they did.

BM: What happened then?

DR: Ah, I just, I let 'em know where it was at, and they asked me to lead them to where it was at, and so, I had it stashed in my, ah, my briefcase, 'cause it has a lock on there, so the kids, they might be playin' around, they won't find it, you know.

BM: Okay. And where was the briefcase at?

DR: It was in my bedroom.

BM: You said the police came into the house with you?

DR: Yes.

BM: You allowed them in the house?

DR: Yes.

BM: Okay. That was your choice?

DR: Yes, it was.

BM: In essence, allowing, consenting them [inaudible].

DR: Yes, they asked about it, and, um, ah, I just let 'em know where it was at, you know.

BM: Okay. You went into the bedroom with the police?

DR: Yes.

BM: Did you open the briefcase for 'em?

DR: Um, I gave them the combination to it and they opened it.

BM: They opened it up?

DR: Yes.

BM: Okay. Ah, what was inside the briefcase?

DR: Um, along with, well the shotgun was there.

(Gov.'s Supplemental Resp. in Opp'n to Def.'s Mot. to Suppress Ex 2.) Defendant added that he had purchased the firearm from K-mart, that the hacksaw he had used to saw off the gun's barrel was in a toolbox in the apartment, and that there was a box of shotgun ammunition in a file cabinet in his bedroom. Defendant then signed the same written consent to search form previously executed by his wife. A subsequent search of the apartment pro-duced the hacksaw, ammunition, and a K-mart sales receipt for the shotgun.

## II. DISCUSSION

For purposes of analysis, the statements and evidence that Defendant seeks to suppress can be can be broken down into the following four categories: (i) oral statements made by Defendant to DuBois and Brann at the scene after he was arrested and before he was given Miranda warnings; (ii) the shotgun, ammunition, and briefcase in which the shotgun was found, that were seized in Defendant's apartment; (iii) oral statements made by Defendant to MacMaster, McSweyn, and DuBois at the Augusta Police Station after he had been advised of his Miranda rights; and (iv) the hacksaw, K-mart sales receipt, and ammunition seized from Defendant's apartment after he and his wife each gave written consent to search their apartment. Since the Government concedes to the suppression of statements made by Defendant at the scene without the benefit of Miranda warnings, the Court need address only the latter three categories.

### A. Shotgun, ammunition, and briefcase

The Fourth Amendment to the Constitution generally prohibits warrantless searches of an individual's home. *See Illinois v. Rodriguez,* 497 U.S. 177, 181, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). "When a criminal defendant moves to suppress evidence seized without a warrant in violation of the Fourth Amendment, the government bears the burden of proving that the warrantless seizure falls within one of the narrow exceptions to the warrant requirement of the Fourth Amendment." *United States v. Ramos–Morales,* 981 F.2d 625, 628 (1st Cir.1992) (Bownes J. dissenting).

In the present case, the Government relies on the well-established consent exception to the warrant requirement to justify the warrantless seizure of the shotgun, ammunition, and briefcase from De-

fendant's apartment.[1] *See Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (holding that prohibition against warrantless searches does not apply to situations in which consent has been obtained from individual whose property is searched). Consent to search is valid only if given voluntarily. *See id.* When determining voluntariness, a court should consider "factors bearing on the vulnerability of the consenting party" such as "age, education, experience, intelligence, and knowledge of the right to withhold consent." *United States v. Barnett,* 989 F.2d 546, 555 (1st Cir.1993). Other relevant considerations include "whether the consenting party was advised of his or her constitutional rights and whether permission to search was obtained by coercive means or under inherently coercive circumstances." *Id.* None of these factors is dispositive. Rather, voluntariness must be assessed in light of the totality of the circumstances. *See United States v. Forbes,* 181 F.3d 1, 5 (1st Cir.1999) (citing *Barnett,* 989 F.2d at 554–55).

▪ Several factors in the present case mitigate against a finding that Defendant's consent was voluntary: Defendant was handcuffed and in custody; he was not given Miranda warnings nor was he advised of his right to withhold consent. Nevertheless, the Court is satisfied that the totality of the circumstances reveals that Defendant freely chose to allow police to conduct their initial search of his apartment.

Brann testified at the hearing that in response to inquiries about the gun, Defendant not only led police into the bedroom of his home and pointed out the

briefcase containing the gun, but provided police with the combination to the briefcase and warned them to use caution when opening it because the gun might be loaded. Such conduct is strongly indicative of consent. Even more telling is Defendant's own account of his encounter with police.[2] Defendant told McSweyn in an interview at the Augusta Police Station that he "cooperated" with police during his arrest and that when asked about the gun he "just let [police] know where it was at." (Ex. 2.) Defendant went on to confirm that he brought police to his bedroom and gave them the combination to the briefcase. In response to a question by McSweyn, Defendant stated that it was his "choice" to allow police into his home. The content of Defendant's comments as well as the level of intelligence and sophistication exhibited by their form indicate that Defendant's will was not "overborne" and that "his capacity for self-determination [was not] critically impaired." *United States v. Watson,* 423 U.S. 411, 424, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976) (internal quotations omitted). Based on the totality of the evidence, the Court finds that Defendant consented to the search of his apartment and that this consent was solely a product of his own free will. Defendant's Motion to Suppress is denied as to the shotgun, ammunition, and briefcase.

## B. Oral statements made at August Police Station

▪ Defendant contends that the statements he made at the Augusta Police Station following receipt of Miranda warnings must be suppressed because they are the

---

**1.** The Government did not raise this argument in its Response to Defendant's Motion to Suppress or at the suppression hearing, relying instead on the doctrine of inevitable discovery and consent to search given by Dana. Following the hearing, however, the Government advised Defendant's counsel that it intended to argue in its Supplemental Brief that Defendant himself consented to the search. Defendant's Supplemental Brief includes a response to this argument.

Since the Court finds that Defendant did, in fact, voluntarily consent to the initial search of his apartment, it need not address the additional theories advanced by the Government.

**2.** As will be discussed *infra* Part II.B, the Court finds that Defendant made these statements after knowingly and voluntarily waiving his Miranda rights.

"fruit" of his prior unMirandized statements. The Supreme Court has made clear, however, that the "simple failure to administer the [Miranda] warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will" does not "so taint[ ] the investigatory process that a subsequent voluntary and informed waiver is ineffective." *Oregon v. Elstad*, 470 U.S. 298, 318, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). Since Defendant does not allege that his initial statements were coerced in any way, "[the] court's task in determining the admissibility of [his] subsequent statement[s] is relatively straightforward. Such ... statement[s are] admissible if [they were] obtained after the Defendant (1) was advised or his or her Miranda rights, and, (2) knowingly and voluntarily waived those rights." *United States v. Marenghi*, 109 F.3d 28, 31–32 (1st Cir.1997).

Defendant acknowledges that McSweyn informed him of his Miranda rights before he was questioned at the August Police Station. Defendant told McSweyn that he understood his rights and proceeded to answer McSweyn's questions. Both the transcript of the interview and the hearing testimony of MacMaster indicate that agents used no intimidating or coercive tactics and that Defendant was quite cooperative and forthcoming. In short, there is nothing in the record to suggest that Defendant's waiver and subsequent statements were not entirely voluntary. The Court therefore denies Defendant's Motion to Suppress as to these statements.

### C. Hacksaw, K-mart receipt, and ammunition

■ In addition to the circumstances discussed with respect to the previous two categories of evidence, the existence of a consent to search form signed by Defendant leads the Court to conclude that he voluntarily consented to a second search of his apartment yielding the hacksaw, K-mart receipt, and ammunition. Thus, De-

fendant's Motion to Suppress is denied as to these items.

### III. CONCLUSION

For the reasons set forth above, Defendant's Motion to Suppress is GRANTED as to statements made by Defendant before he was given Miranda warnings and DENIED as to all other statements and evidence.

*SO ORDERED.*