UNITED STATES of America

v.

**Carlos ESQUILIN, Defendant.**

**No. Crim. 98–51–P–C.**

United States District Court,
D. Maine.

Feb. 9, 1999.

## MEMORANDUM AND ORDER DENYING MOTIONS TO SUPPRESS EVIDENCE

GENE CARTER, District Judge.

On October 22, 1998, Defendant Carlos Esquilin was indicted on one count of knowingly and intentionally possessing cocaine with the intent to distribute in violation of Title 21, United States Code, Section 841(a)(1). Indictment (Docket No. 9). Presently before the Court are Esquilin's motions to suppress (Docket Nos. 11, 13). In his motions, Mr. Esquilin asks this Court to suppress as evidence in this case any and all physical evidence seized and any and all statements made during the course of his arrest on September 17, 1998, at the Westbrook Super 8 Motel. After receiving testimony in an evidentiary hearing conducted on January 5, 1999, and reviewing the arguments of the parties, the Court concludes that Mr. Esquilin's motions should be denied.

### I. BACKGROUND

The facts of this case, as set forth in the evidentiary hearing, are as follows: On September 17, 1998, at approximately 3:00 p.m., Westbrook Police Detective Kenneth Viger received a call from the manager of the Westbrook Super 8 Motel. Transcript of January 5, 1999 Proceedings ("Transcript") (Docket No. 16) at 4–5. The manager informed Detective Viger that she suspected drug activity in room 201 at the hotel. Transcript at 4–5. The manager stated that her suspicion was based on a large number of phone calls that had been made to room 201, the large number of visitors to the room, and the fact that the room was paid for in cash. Transcript at 5. The manager also told Detective Viger that the room had originally been rented by the individual Martin Wright and had been re-rented jointly by Martin Wright and Carlos Esquilin. Transcript at 6.

After receiving this tip from the hotel manager, who had previously been a reliable informant of drug activity at the mo-

Jonathan R. Chapman, AUSA, Office of the U.S. Attorney, Portland, Maine, for the government.

Edmund R. Folsom, Portland, Maine, for defendant.

tel, transcript at 44, 53, Detective Viger called the Maine Drug Enforcement Agency ("MDEA") to see if they had heard of either Mr. Wright or Mr. Esquilin. Transcript at 6. The MDEA had heard of Mr. Wright but had not heard of Mr. Esquilin. Transcript at 6. In addition, Detective Viger contacted his canine handler, Officer Philip Hebert, and made arrangements to go to the Super 8 Motel. Transcript at 6–7. Detective Viger and Officer Hebert met at the motel at approximately 3:45 p.m. Officer Hebert arrived with his trained drug-detection German shepherd police dog, Zena. Transcript at 7, 111–112. Detective Viger was in plain clothes with an "exposed badge and sidearm"[1] and Officer Hebert was carrying an exposed firearm and wearing his Westbrook Police canine handler uniform which has an exposed police badge. Transcript at 9, 45–46. Upon arriving at the motel, the officers met once more with the manager, who confirmed the information she had provided Viger earlier that afternoon, and the officers then proceeded to room 201. Transcript at 7–8.

Officer Hebert testified that when they arrived on the second floor of the Motel, outside room 201, the drug-detection dog, who was not then on a leash, immediately went to the door of room 201 and began "sniffing hard at the bottom of the door." Transcript at 121. Officer Hebert then gave the dog the drug-detection command, "find dope," and, in response, the dog approached several doors in the hallway in a circular motion and then returned to the door to room 201 and sniffed again at the bottom of the door. Transcript at 121. Officer Hebert testified that the dog was "drawing deep nasal exchanges" at room 201 and that he concluded that the dog smelled narcotics inside the room. Transcript at 122. Officer Hebert then restrained the dog on a leash and Detective Viger knocked on the door to room 201. Transcript at 122.

After the second knock, Mr. Esquilin answered the door. Transcript at 9. Detective Viger smelled a strong odor that he believed to be marijuana coming from room 201 once the door was ajar. Transcript at 49. Detective Viger introduced and identified himself as a police officer, showed Mr. Esquilin his identification and badge, and introduced Officer Hebert and the dog. Transcript at 9. Detective Viger explained to Mr. Esquilin that the manager of the hotel suspected drug activity and that the officers were there to investigate. Transcript at 10. Detective Viger asked Mr. Esquilin, "do you mind if we come in and talk." Transcript at 10, 49. With both officers and the dog in full view, Mr. Esquilin said, "sure, come on in." Transcript at 10, 27–28.[2] Detective Viger did not inform Mr. Esquilin that he had any right to deny their entry nor was any specific mention made of the dog entering the room. Transcript at 24–25, 28, 29–30, 49, 123.

When the officers and the drug-detection dog entered the room, Detective Viger asked Mr. Esquilin to sit in the recliner chair that was in the room. Transcript at 11. Both Detective Viger and Officer He-

---

1. The Court interprets Detective Viger's testimony on this point as meaning that he was wearing an exposed badge and carrying a firearm that was not exposed.

2. Mr. Esquilin argues that because Officer Hebert testified that Mr. Esquilin issued a "casual" invitation for the officers to enter the room, transcript at 123, Detective Viger's testimony is not credible. Mr. Esquilin argues that while Detective Viger testified that Mr. Esquilin appeared nervous, Officer Hebert described the invitation into the room as casual, thus impeaching Detective Viger's testimony. The Court does not agree that Officer Hebert's testimony makes Detective Viger's testimony more or less credible. The officers' impression of Mr. Esquilin's general appearance and the tone of his invitation into the room do not change the fact that Mr. Esquilin invited the officers, one of whom was holding a drug-detection dog on a leash, into the room. In addition, although Officer Hebert described Mr. Esquilin as casual rather than nervous, he testified that Mr. Esquilin said, "sure come in," just as Detective Viger testified. Transcript at 123.

bert described Mr. Esquilin as appearing extremely nervous, as shaking severely, as rocking back and forth in his chair, and as avoiding eye contact with the officers. Transcript at 14, 32, 119. When Mr. Esquilin attempted to stand up, Detective Viger caused him to sit down again. Transcript at 31. In addition, when Mr. Esquilin requested that he be allowed to put on socks and underwear, Detective Viger denied his request. Transcript at 31, 14.[3]

The motel room had a standard layout, with a small hallway as one enters the room, the bathroom to the right near the entrance, and a window in the far corner. Transcript at 12. Mr. Esquilin was seated in a chair by the window. Transcript at 12. Once in the room, Detective Viger questioned Mr. Esquilin generally about the purpose of his visit to Maine and the nature of his relationship with Mr. Wright. Transcript at 12–15. Although Officer Hebert had not given the dog the "find dope" command, the dog was tugging at the leash toward the middle of the room, sniffing vigorously, and this indicated to Officer Hebert, trained in canine drug detection, that there were narcotics in the room. Transcript at 113, 114. According to Detective Viger, at some point, Officer Hebert asked Mr. Esquilin if he could walk across the room and look outside the window. Transcript at 34, 50–51. When Mr. Esquilin consented, Officer Hebert stepped out of the entrance way and crossed the room with the drug-detection dog on a leash, transcript at 35–36, and Mr. Esquilin called the dog over and began to pet her. Transcript at 34–51.

The testimony of Officer Hebert and Officer Gerard Brady, who arrived later on the scene and was briefed on the situation by Detective Viger, regarding the behavior of the dog before Detective Viger asked Mr. Esquilin permission to search the room, slightly contradicts that given by Detective Viger. Detective Viger denied any knowledge that the dog sniffed around the room during his initial questioning of Mr. Esquilin, transcript at 33–34, except for when Officer Hebert asked to cross the room to look out the window. In contrast, Officer Hebert testified that during the time that Detective Viger questioned Mr. Esquilin, the drug-detection dog, while on a six-foot leash, wandered around the room and sniffed at the bed mattresses, the night table, the drawer of the telephone stand, the shopping bags in the room, and Mr. Esquilin's person. Transcript at 126–32. In addition, Officer Brady testified that according to his report which was based on information provided to him by Detective Viger, upon entering the room, the dog indicated that there were possibly drugs in one of the bags. Transcript at 86. The Court is inclined to believe Officer Hebert's version of the facts as he was the trained officer in canine drug detection holding the leash of the dog and best able to observe and interpret the dog's actions. In addition, Detective Viger admitted that he had been given a signal from Officer Hebert that the dog's behavior indicated that narcotics were present. Transcript at 51. It is thus more likely that the dog was sniffing inside the room than standing in the doorway. Thus, from the testimony at the hearing, the Court finds that the dog was sniffing around the room and indicating to Officer Hebert that there were narcotics in the room.

Based on the behavior of the dog, the nervous state of Mr. Esquilin, and the fact that Mr. Esquilin was getting confused by and was unable to answer Detective Viger's questions, Detective Viger suspected that there were drugs in the room and asked Mr. Esquilin's permission to look around to make sure there were not. Transcript at 15, 51. Mr. Esquilin responded by telling him, "go ahead" and "look anywhere you want." Transcript at 15. Once Mr. Esquilin gave the officers

---

**3.** Officer Hebert testified that Mr. Esquilin made the request to put on underwear and socks several times. Transcript at 125–26.

permission to search the room, Officer Hebert gave the drug-detection dog the command, "find dope." Transcript at 115. The dog went immediately to the left corner of the room, sniffed the bags it had been sniffing prior to Detective Viger's request to search the room, poked its nose in a GAP shopping bag, and pulled out a Ziplock bag containing cocaine. Transcript at 116–17. Detective Viger asked Mr. Esquilin what was in the bag and Mr. Esquilin answered that it was cocaine. Transcript at 17. Detective Viger immediately handcuffed Mr. Esquilin and sat him on the floor. Transcript at 18. After placing Mr. Esquilin under arrest, Detective Viger left the room to call for backup and was gone from the motel room for approximately ten minutes, leaving Officer Hebert, the dog, and Mr. Esquilin in the room. Transcript at 19, 37.

A considerable amount of time passed between Mr. Esquilin's arrest and the time when he was read the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). After Mr. Esquilin's arrest, Detective Viger, Officer Hebert, and Mr. Esquilin waited in the hotel room for further police assistance for approximately 20 minutes. Transcript at 20, 56. Detective Viger did not read Mr. Esquilin a *Miranda* warning at any time while the three remained in the motel room. Transcript at 19–20. According to Detective Viger, the only conversation that Mr. Esquilin and he had after Mr. Esquilin was placed under arrest consisted of Mr. Esquilin asking what was going to happen to him and Detective Viger answering that he would not talk to Mr. Esquilin before reading him a *Miranda* warning. Transcript at 20.

Approximately twenty minutes after the call for backup was made, Officer Brady, drug investigation officer of the MDEA arrived. Upon Officer Brady's arrival, Detective Viger briefed him on the events that had led up to Mr. Esquilin's arrest and informed him that Mr. Esquilin had not been read his *Miranda* warning.

Transcript at 57. Despite his knowledge that Mr. Esquilin had not been read his *Miranda* warning, Officer Brady approached Mr. Esquilin and asked him questions. Transcript at 77. Officer Brady asked Mr. Esquilin if he knew why he was being detained, and Mr. Esquilin motioned toward the cocaine and replied that it was because of the drugs. Transcript at 58, 77. Officer Brady additionally asked Mr. Esquilin how much cocaine was there and Mr. Esquilin answered that there were nine ounces total. Transcript at 58. When a pager located on a nearby night stand went off, Officer Brady picked it up and asked Mr. Esquilin if he minded whether he looked at the pager. Transcript at 62–63, 65, 78. Mr. Esquilin shook his head that he did not mind and Officer Brady displayed the number that was on the pager. Transcript at 63. When he asked Mr. Esquilin whose number was displayed, Mr. Esquilin replied that it was the number of his girlfriend. Transcript at 79.

At this point, Officer Brady read Mr. Esquilin his *Miranda* warning using a standard *Miranda* warning card. Transcript at 61–63. Mr. Esquilin signed the *Miranda* card. Transcript at 62. After Officer Brady read Mr. Esquilin the *Miranda* warning, he continued to question him. Transcript at 66. Generally, Officer Brady asked whether anyone else was involved in the selling of the cocaine, where Mr. Esquilin got the cocaine, how much the cocaine cost, and whether or not Mr. Wright was involved or had set him up in the motel room to sell the cocaine. Transcript at 66. Officer Brady also asked Mr. Esquilin about his local customers. Transcript at 66. Officer Uri Shafir, a special agent with the Drug Enforcement Administration, arrived as the *Miranda* warning was being read to Mr. Esquilin and joined in the questioning. Transcript at 67. Mr. Esquilin answered the officers' questions.

At approximately 5:30 p.m., Mr. Esquilin was taken from the motel and put in police custody. Transcript at 70. The officers

remained in the room until later that evening using Mr. Esquilin's pager to obtain the phone numbers of people placing calls to that pager over the course of the evening. Transcript at 69, 89.

## II. ANALYSIS

Mr. Esquilin seeks to suppress as evidence in this case the physical evidence seized as a result of the search by the police of his motel room. This evidence consists of cocaine and money in the amount of $3,770. Mr. Esquilin also seeks to suppress as evidence a slip of paper seized by the government from Mr. Esquilin's clothing several days after September 17, 1998. In addition, Mr. Esquilin seeks to suppress as evidence at trial, the statements made by him while in custody before and after he was issued a *Miranda* warning. At the evidentiary hearing on January 5, 1999, the government assured the Court that it will not seek to use the slip of paper seized from Mr. Esquilin's clothing and will not seek to use any statements by Mr. Esquilin made to the officers before the officers administered Mr. Esquilin a *Miranda* warning. Transcript at 137–39. Accordingly, for purposes of the motions to suppress before the Court, the Court must determine the following: (1) whether the physical evidence should be suppressed as evidence at trial because the search was conducted in violation of the Fourth and Fourteenth Amendments· to the United States Constitution and (2) whether the statements made by Mr. Esquilin *after* the *Miranda* warning was given should also be suppressed as evidence.

### A. Physical Evidence.

■ In his motion to suppress as evidence the cocaine and money seized from his motel room, Mr. Esquilin argues that he did not voluntarily consent to the warrantless search of his room. He contends that he did not voluntarily consent to the officers' initial entry to his room and that the ensuing search conducted in the room was also not the product of Mr. Esquilin's voluntary consent. "It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is *per se* unreasonable subject to only a few and specifically established and well-delineated exceptions," which include consensual searches. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973) (citing cases). "The voluntariness of a consent to search turns on an assessment of the totality of the circumstances," *United States v. Barnett,* 989 F.2d 546, 554–55 (1st Cir.1993), and "when [the government] seeks to rely upon consent to justify the lawfulness of a search, [it] has the burden of proving that the consent was, in fact, freely and voluntarily given." *Schneckloth,* 412 U.S. at 222, 93 S.Ct. at 2045.

■ The test of voluntariness is whether the consent was the product of an essentially free and unconstrained choice by the maker, *see id.* at 225, 93 S.Ct. at 2047, and is a question of fact to be determined from all the surrounding circumstances. *Id.* at 248–49, 93 S.Ct. at 2059. "If, under all of the circumstances it has appeared that the consent was not given voluntarily—that it was coerced by threats of force, or granted only in submission to a claim of lawful authority—[a court may find] the consent invalid and the search unreasonable." *See id.* at 233, 93 S.Ct. at 2051 (citing cases). The Court must consider such factors as the vulnerability, age, education, experience, intelligence of the consenting party, and his knowledge of the right to withhold consent. *See Barnett,* 989 F.2d at 555. In addition, the Court should consider whether permission to search was obtained by coercive means or under inherently coercive circumstances. *See id.* Furthermore, the court may consider whether the consenting party was advised of his or her constitutional rights. *See id.*

■ The Court is convinced that Mr. Esquilin voluntarily consented to the officers' entry into his motel room. There is no sign that the officers used trickery or

deliberate intimidation in order to coerce Mr. Esquilin into consenting to letting the officers enter his motel room. Detective Viger plainly told Mr. Esquilin that the officers were there to investigate suspected drug activity. Transcript at 10. The Court disagrees with Mr. Esquilin's contention that the officers' declaration that they were there to investigate drug activity was a coercive show of authority. Additionally, Detective Viger identified himself with his badge and introduced Officer Hebert, who was wearing a canine unit police uniform. Transcript at 9, 46. The officers did not use force or intimidation to enter the room. Indeed, neither officer had his gun drawn. There is also no evidence that the officers promised retaliation if Mr. Esquilin did not let them into the room. The officers told Mr. Esquilin why they were there and asked whether they could enter the room. It is not disputed that Mr. Esquilin said, "sure, come in" with the officers and the drug-detection dog in full view. Transcript at 10, 27–28.

▇▇ Although Mr. Esquilin argues that he was intimidated, courts have found voluntary consent to search under more daunting circumstances. *See United States v. Blais,* 98 F.3d 647, 650–51 (1st Cir.1996) (rejecting argument that search was inherently coercive because suspect was a 69–year–old man confronted by two officers and a security guard); *Barnett,* 989 F.2d at 555–56 (finding consent voluntary where seven officers had entered the home of seasoned criminal defendant with guns drawn); *United States v. Arango–Correa,* 851 F.2d 54, 57 (2d Cir.1988) (finding consent voluntary after suspect had been in custody for five hours). There is also no sign that Mr. Esquilin did not understand that he was consenting to the officers' entrance into the motel room knowing that they were investigating suspicions that he was involved with drug trafficking. Mr. Esquilin is an adult, and there is no evidence that Mr. Esquilin does not speak English adequately or that he has less than average intelligence. It is

true that Detective Viger and Officer Hebert did not advise Mr. Esquilin that he had a right to refuse entry to his room at the motel. However, prior knowledge of a right to refuse is not a prerequisite of a voluntary consent. *See Schneckloth,* 412 U.S. at 234, 93 S.Ct. at 2051; *Blais,* 98 F.3d at 650; *United States v. Zapata,* 18 F.3d 971, 977 (1st Cir.1994); *Barnett,* 989 F.2d at 555. Thus, the officers' failure to inform Mr. Esquilin that he had a right to refuse to let them enter the room does not preclude a finding of valid voluntary consent.

Mr. Esquilin argues that discrepancies in the testimony of the officers at the evidentiary hearing demonstrate that the government's evidence is not credible and, therefore, that the government cannot meet its burden of demonstrating that the consent to enter the room was voluntary. Mr. Esquilin contends that Detective Viger clearly had sufficient information to support probable cause to obtain a warrant and that Detective Viger was testifying dishonestly when he said that he felt that he did not have enough evidence for a warrant. Detective Viger testified that he had briefly considered obtaining a warrant for room 201 before knocking and requesting entrance but felt that he did not have enough information for a warrant at that time with just the motel manager's information. Transcript at 52–53. The fact that Detective Viger may or may not have had sufficient evidence to support probable cause for a warrant does not contradict the conclusion on the part of Detective Viger that he believed he did not. The Court does not hold that the information retained by Detective Viger at that time was or was not enough to support a warrant. The Court notes, however, that there was nothing unreasonable about Detective Viger's judgment call under the circumstances at the time. Thus, the fact that Mr. Esquilin concludes that Detective Viger in fact had enough evidence to obtain a warrant despite the fact that Detective Viger concluded he did not does not call Detective Viger's credibility into ques-

tion. After careful consideration and a review of the transcript from the evidentiary hearing, the Court rejects Mr. Esquilin's additional attempts to point out contradictions that he believes tend to show that Detective Viger's testimony should not be relied upon.

A careful review of the evidentiary record demonstrates that Mr. Esquilin voluntarily consented to the officers and the drug-detection dog entering his motel room. He was not involuntarily acquiescing to a show of authority. *See Schneckloth*, 412 U.S. at 233, 93 S.Ct. at 2051 (reasoning that consent is not voluntary if under all of the circumstances, it was granted only in submission to a claim of lawful authority). Indeed, the Court is hard pressed to find evidence, on this record, of any show of authority beyond that inherent in the display of a police badge. The government has, thus, met its burden and shown that Mr. Esquilin expressly and voluntarily consented to the entrance, by the officers and the drug-detection dog, into his motel room.

■ Mr. Esquilin also contends that the police illegally searched his motel room through the actions of the drug-detection dog before they asked specific permission to search. Both officers and the drug-detection dog were in Mr. Esquilin's full view when he consented to their entry. Transcript at 10, 27–28. Thus, Mr. Esquilin's invitation to enter included the dog. The evidence adduced at the hearing demonstrates that once inside the room, the drug-detection dog sniffed vigorously around the room and, according to Officer Hebert, indicated to the officers that narcotics were in the room. Transcript at 126–32. Testimony at the evidentiary hearing indicated that neither Detective Viger nor Officer Hebert told Mr. Esquilin that the dog would automatically begin sniffing for narcotics once it entered the room. However, an officer is not required to obtain specific consent regarding a drug-detection dog's sniff under the law.

Indeed, the law does not regard a dog sniff as a search under the Fourth Amendment.

In considering whether canine sniffs of airport luggage violated the Fourth Amendment, the Supreme Court held that "despite the fact that ["a 'canine sniff' by a well-trained narcotics detection dog"] tells the authorities something about the contents of the luggage, the information obtained is limited." *United States v. Place*, 462 U.S. 696, 707, 103 S.Ct. 2637, 2644–45, 77 L.Ed.2d 110 (1983). Accordingly, the Supreme Court held that a drug-detection dog sniff is not a search within the meaning of the Fourth Amendment. *See id; see also United States v. Rodriguez–Morales*, 929 F.2d 780, 788 (1st Cir.1991) (holding that a canine sniff of a legally impounded automobile is not a search). In addition, one court has questioned whether a dog's behavior could, by itself, be adequate proof that a controlled substance is present to support probable cause for an arrest. *See United States v. Race*, 529 F.2d 12, 14 (1st Cir.1976).

■ Mr. Esquilin argues that the canine sniff in this case is different than a sniff of luggage in an airport or an impounded automobile. Here, Mr. Esquilin contends, the canine sniff was a search under the Fourth Amendment, for which the officers did not have consent, because it occurred in his motel room where a greater privacy interest exists. Under the circumstances of this case, the Court is not persuaded that there is a persuasive reason to apply the rule of Place more grudgingly to canine sniffs performed in motel rooms in which the officers were invited to enter. Mr. Esquilin consented to the drug-detection dog entering the room. Transcript at 10, 27–28. Once Mr. Esquilin consented to the entrance of the dog into the room, the activity of the dog, even though it communicated useful information to Detective Viger and Officer Hebert about the contents of the room, was not a search under the Fourth Amendment. It did not require the opening of any of the bags in the room or the moving of any of

the furniture. Furthermore, it did not expose noncontraband items that would otherwise remain hidden from public view as an officer searching the room would do. Thus, the canine sniff under the circumstances of this case was not a search within the meaning of the Fourth Amendment requiring specific consent. The dog was lawfully in the room once Mr. Esquilin consented to its entrance and it was not necessary for the officers to obtain Mr. Esquilin specific consent to the dog's sniffing for narcotics once inside the room.

Finally, Mr. Esquilin argues that his specific consent for the officers to search the room was coerced. He argues that the atmosphere in the motel room was sufficiently coercive to render his consent involuntary because, for approximately half an hour, Detective Viger made him sit in a chair while he questioned him and would not let him put on socks or underwear, and the drug-detection dog was straining at the leash and sniffing vigorously at the bed mattress, telephone table, and bags and packages in the room. Notwithstanding the unnerving effect of having to sit for half an hour and having a drug-detection dog sniffing your possessions, these circumstances are not coercive. Although Mr. Esquilin was reportedly nervous and confused by his questioning by Detective Viger, there is simply no evidence that Mr. Esquilin's will was overborne, nor his "capacity for self-determination critically impaired." *See Barnett,* 989 F.2d at 556. Accordingly, when Detective Viger asked Mr. Esquilin whether the officers could search the room, Mr. Esquilin voluntarily consented when he said, "go ahead" and "look anywhere you want." Transcript at 15, 130–31. To conclude, the Court finds that the totality of the circumstances establish that Mr. Esquilin voluntarily consented to the officers' search of his motel room.

**B. Post–*Miranda* Statements.**

Having determined that the physical evidence found in Mr. Esquilin's motel room should not be excluded, the Court must decide whether the statements issued after a *Miranda* warning was administered are admissible. To summarize the situation presented by the case at bar, Mr. Esquilin made incriminating statements to Officer Brady without having been given the warnings required by *Miranda.* The admissibility of these statements is not in dispute because the government has represented to the Court that it will not seek to submit these statements as evidence at trial. Transcript at 137–39. After Mr. Esquilin was read his *Miranda* warning, however, and in response to further questioning by Officers Brady and Shafir, Mr. Esquilin waived those rights and made several more incriminating statements. Transcript at 66. The issue presented by this motion is whether the initial failure of the officers to administer to Mr. Esquilin the warnings required under *Miranda* tainted the subsequent statements made by Mr. Esquilin after he had been fully advised of and had waived his *Miranda* rights, rendering these later statements inadmissible at trial.

The legal doctrine applicable to this situation was developed by the Supreme Court in *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), wherein a burglary suspect gave a pre-*Miranda* incriminating statement to police officers and subsequently gave a full written confession after he had been issued his *Miranda* warning and taken to the station house. *See id.* at 301, 105 S.Ct. at 1289. It was undisputed that the earlier statement had been given voluntarily. *See id.* at 302, 105 S.Ct. at 1289. The Supreme Court concluded that "a simple failure to administer the *Miranda* warning, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will," does not so taint the investigatory process that a subsequent voluntary and informed waiver is ineffective. *See id.* at 309, 105 S.Ct. 1285, 105 S.Ct. at 1293. Under the

general *Elstad* rule, the rendering of a later *Miranda* warning, after an unwarned voluntary confession, cures the condition that rendered the earlier unwarned statement inadmissible. Thus, the fact of a prior statement issued in the absence of a *Miranda* warning, standing on its own, does not unconstitutionally taint subsequent statements made after a full *Miranda* warning and waiver of those rights so as to render them automatically inadmissible. *See United States v. Byram*, 145 F.3d 405, 409 (1st Cir.1998) (holding that in *Elstad*, the Supreme Court flatly forbade automatic application of the fruit of the poisonous tree doctrine for *Miranda* violations).

 The Supreme Court in *Elstad* rejected the defendant's contention in that case that despite the later *Miranda* warning, a subtle form of compulsion still remained and rendered the later statements involuntary due to the psychological impact of the suspect's conviction that he had given away too much prior to the warning and, in so doing, had sealed his own fate. *See Elstad*, 470 U.S. at 311, 105 S.Ct. at 1294. The Supreme Court rejected finding a "subtle form" of compulsion legally significant and reasoned that a distinction must be made in the law between "the direct consequences flowing from coercion of a confession by physical violence or other deliberate means calculated to break the suspect's will and the uncertain consequences of disclosure of a 'guilty secret' freely given in response to an unwarned but noncoercive question...." *See id.* at 312, 105 S.Ct. at 1295. Accordingly, when police ask questions of a suspect in custody without administering the required *Miranda* warnings, the answers received are presumed to be compelled and not voluntary and are, thus, excluded from evidence at trial. There is no warrant, however, for presuming coercive effect on a later post-*Miranda* statement where the suspect's

initial statement was voluntary, though made in the face of a technical violation. *See United States v. Marenghi*, 109 F.3d 28, 31–32 (1st Cir.1997) (holding that "[w]hen law enforcement officials do not deliberately engage in coercive or improper tactics in obtaining an initial statement, but rather only fail to advise a defendant of his or her *Miranda* warnings," the subsequent statement is admissible if the defendant was advised of his or her *Miranda* rights and voluntarily and knowingly waived such rights); *United States v. Marenghi*, 896 F.Supp. 207, 216 (D.Me.1995), *aff'd* 109 F.3d 28 (1st Cir.1997) (explaining the fact that earlier statement was coerced in addition to being given in absence of *Miranda* does not compel the suppression of the later statement; a court should look to the circumstances to determine if the coercion of the earlier statement operates to render the later "Mirandized" statement essentially involuntary as well).

 Here, though belated, the reading of Mr. Esquilin's rights by Officer Brady was undeniably complete.[4] Officer Brady testified at the evidentiary hearing that he read the *Miranda* warnings aloud from a printed card and recorded Mr. Esquilin's responses, and that Mr. Esquilin signed the *Miranda* card. Transcript at 59–62. Despite the fact that Officer Brady had questioned Mr. Esquilin before he administered *Miranda* and had obtained inadmissible incriminating answers, under *Elstad*, these later answers are not presumed to have been compelled or tainted by the earlier failure to administer the *Miranda* warning. The possible feelings of despair and resignation that Mr. Esquilin may have felt, after he had been properly administered a *Miranda* warning, due to the fact that he had already sealed his fate when he told the officers that the cocaine found in room 201 of the motel belonged to him is not sufficient evidence of compulsion so as to render his

---

4. There is no dispute that Mr. Esquilin was in custody during the interrogation by Officer Brady.

later, post-*Miranda* answers compelled and, thus, require them to be excluded. The administration of the *Miranda* warning by Officer Brady served to remove the conditions that precluded admission of the earlier statements, and the Court may infer from the facts surrounding the second disclosure that Mr. Esquilin made a rational and intelligent choice whether to waive or invoke his rights.

■■■ The Court's inquiry, however, does not end here. An exception to the curative force of a later *Miranda* warning exists which Mr. Esquilin argues covers the circumstances of his interrogation in this case. Under the *Elstad* doctrine, although the lone failure to read *Miranda* before the suspect's initial statements can be cured by the issuance of a later *Miranda* warning and a knowing and voluntary waiver of those rights, if the initial statements were made as the result of coercive or improper tactics so that they are involuntary, then the determination of the subsequent statement's admissibility is much more involved. *See Marenghi,* 109 F.3d at 32. In such a case, for the later statements to be admissible, a court must ensure that they were made in an "atmosphere devoid of coercion or compulsion" and are sufficiently removed from the "milieu" of the coerced statement so as to "preclude any lingering taint." *Id.* Mr. Esquilin argues that Officer Brady's misconduct in eliciting the initial pre-*Miranda* statements transcended a mere failure to issue Mr. Esquilin his *Miranda* warning and that because the initial statements were the result of coercive and improper tactics, the Court must take a closer look at the voluntariness of the post-*Miranda* statements.

Mr. Esquilin points to several factors that he believes demonstrate that Officer Brady's tactics were coercive and the atmosphere in the motel room was one of compulsion. The Court disagrees that the factors, considered separately or together, demonstrate that Officer Brady used coercive tactics. First, Mr. Esquilin contends that because the initial search was illegal and, therefore, intimidating, the issuance of the *Miranda* warning did not cure the compulsive atmosphere in the motel room and the later statements were compelled. As discussed *supra* section II A, the search was legally conducted with Mr. Esquilin's consent. Accordingly, the Court rejects the argument that the earlier statements were coerced because Mr. Esquilin was intimidated by the unlawful search conducted by the officers.

■■■ To prove that his pre-*Miranda* statements were involuntary, Mr. Esquilin also argues that Officer Brady's tactics were coercive. Specifically, he points to the fact that Officer Brady picked up Mr. Esquilin's beeper before asking Mr. Esquilin whether or not he could read the call. Transcript at 62–63, 65, 78. Mr. Esquilin contends that this action indicated to Mr. Esquilin that his consent was immaterial and, thus, that Officer Brady's tactics were coercive. The Court disagrees with the contention that the conduct on the part of Officer Brady regarding the beeper was coercive so as to render Mr. Esquilin's responses involuntary. In order to successfully demonstrate that his statements were coerced, Mr. Esquilin must demonstrate some specific conduct by a law enforcement officer constituting coercion. *See Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 521–22, 93 L.Ed.2d 473 (1986) ("We hold that coercive police activity is a necessary predicate to the finding that a confession is not voluntary within the meaning of the Due Process Clause of the Fourteenth Amendment"). The voluntariness of a statement "depends on whether the will of the defendant was overborne so that the statement was not his free and voluntary act, and that question is to be resolved in light of the totality of the circumstances." *Marenghi,* 109 F.3d at 33. Only confessions procured by coercive official tactics should be excluded as involuntary. *See Byram,* 145 F.3d at 407. Mr. Esquilin cannot show that Officer Brady's tactics were coercive and intimidating.

Whether improper police coercion occurred depends on the circumstances. Here, there is no indication that the circumstances were intimidating. The police officers did not threaten Mr. Esquilin with violence or serious retaliation if he did not answer their questions. The act by Officer Brady of picking up Mr. Esquilin's beeper, even if Mr. Esquilin believed that this act indicated that his consent to Officer Brady's reading the number was immaterial, is not the type of coercion that renders statements made in response to a plain inquiry involuntary. The First Circuit Court of Appeals has recently noted that,

> [c]ertainly some types of police trickery can entail coercion .... [b]ut trickery is not automatically coercion. Indeed, the police commonly engage in such ruses as suggesting to a suspect that a confederate has just confessed or that police have or will secure physical evidence against the suspect. While the line between ruse and coercion is sometimes blurred, confessions procured by deceits have been held voluntary in a number of situations.

*Byram*, 145 F.3d at 408 (citing cases). Any questioning by police is likely to be intimidating especially just after you have been arrested. However, "bowing to events, even if one is not happy about them, is not the same thing as being coerced." *Robbins v. MacKenzie*, 364 F.2d 45, 50 (1st Cir.) *cert. denied*, 385 U.S. 913, 87 S.Ct. 215, 17 L.Ed.2d 140 (1966). Given the narrowed definition of coercion under the law and the legality of ruses and trickery by the police, it would be very hard to treat as coercion Officer Brady's picking up of the beeper prior to asking Mr. Esquilin if he may read it. Accordingly, the Court rejects Mr. Esquilin's contention that the act of picking up the beeper shows that Officer Brady's methods were coercive or, even, deliberately intimidating.

Mr. Esquilin also argues that the constitutional infirmity of the pre-*Miranda* statements was not cured automatically by a later *Miranda* warning because Officer Brady's actions were outrageous conduct that cannot be tolerated by those sworn to enforce the law. Courts have the power to deter such misconduct by suppressing the fruits of outrageous and shocking tactics on the part of law enforcement officers. *See Byram*, 145 F.3d at 408. Officer Brady testified that he does not always read the *Miranda* warning to a suspect in custody before he begins to ask questions. Transcript at 72–75. Officer Brady did not explain the purpose of his strategy, but the logical explanation is that if the suspects divulge information before they are aware that they have a right not to answer questions, they will waive *Miranda* and continue to answer questions because they feel they have already incriminated themselves and are unaware that the earlier statements will be suppressed. The argument that the later statements should, in fact, be excluded because they are involuntary due to the effect of the earlier incrimination is the argument rejected by the Supreme Court in *Elstad*. Police investigation is a rough business and necessarily involves trickery and strategy in order to solve a specific crime that has been or is being committed. Although the Court does not condone tactics designed to take advantage of a suspect's ignorance of his or her constitutional rights, the tactics engaged in by Officer Brady[5] in this case do not shock the conscience and are not so outrageous that the

5. The Court notes, for the elucidation of Officer Brady and law enforcement officers generally, that, to the extent this conduct is a deliberate or an oft-repeated strategy, it is an unwise one. It flirts with the risk of ultimate exclusion of otherwise admissible evidence. For officers to deliberately engage in such risk-taking calls in question the good faith of their intentions in respecting the public's constitutional rights. Having created such a threatening penumbra, they should not be surprised if in future cases where similar conduct is indulged, a very slight factual deviation in the circumstances may lead courts to call down upon them the exclusionary doom with which they have chosen to trip the light fantastic.

Court should suppress the fruit of such tactics. Indeed, the Supreme Court held in *Elstad* that such fruits are *not* to be automatically suppressed as evidence.

■ Finally, Mr. Esquilin argues that his statements issued after the *Miranda* warning was administered are not protected from suppression under the *Elstad* doctrine under the exception carved out by the United States Court of Appeals for the First Circuit in *United States v. Byram.* In that case, noting its lack of Supreme Court precedent, the First Circuit Court of Appeals noted that,

> *Elstad* does not wholly bar the door to excluding evidence derived from a *Miranda* violation—at least where the *Miranda* violation is not merely technical, where there is a substantial nexus between the violation and the second statement, and where the second statement is not itself protected by an adequate *Miranda* warning.

*Byram,* 145 F.3d at 409–10. This is not, however a description of the present case. Unlike *Byram,* the second set of statements sought to be suppressed in this case were protected by an adequate *Miranda* warning. Mr. Esquilin does not, because he cannot, point to any deficiency in the *Miranda* warning belatedly issued by Officer Brady. Instead, Mr. Esquilin focuses on Officer Brady's general technique of questioning suspects discussed above. The Court has noted its unwillingness to encourage such tactics but declines to find them so outrageous that they are presumptively coercive. Furthermore, the Court does not find that the evidence of Officer Brady's strategy renders the failure to give the first *Miranda* warning more than a technical violation. Accordingly, the facts of this case do not fit the requirements of the *Byram* exception to the *Elstad* rule.

■ The conduct of Officer Brady in his initial questioning of Mr. Esquilin did not transcend the failure to issue Mr. Esquilin his *Miranda* warning. Taken together and separately, the tactics and factors identified by Mr. Esquilin were not coercive or improper and did not create an atmosphere of coercion and compulsion that a later *Miranda* warning could not cure. The administration of the later *Miranda* warning by Officer Brady sufficiently removed the conditions of coercion caused by the earlier failure to administer a *Miranda* warning prior to questioning Mr. Esquilin. Accordingly, the statements issued by Mr. Esquilin after he was administered a *Miranda* warning were voluntary. Hence, the Court concludes that the set of statements given by Mr. Esquilin after he was read a *Miranda* warning by Officer Brady should not be suppressed.

### III. CONCLUSION

Accordingly, the Court **ORDERS** that Mr. Esquilin's motion to suppress physical evidence be, and is hereby, **DENIED.** In addition, the Court **ORDERS** that Mr. Esquilin's motion to suppress statements be, and is hereby, **DENIED.**

**SO ORDERED.**