# United States Court of Appeals
## For the First Circuit

No. 99-1826

UNITED STATES,

Appellee,

v.

CARLOS ESQUILIN,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. Gene Carter, U.S. District Judge]

Before

Torruella, Chief Judge,
Selya and Lipez, Circuit Judges.

Jane Elizabeth Lee for appellant.
F. Mark Terison, Assistant U.S. Attorney, with whom Jay P. McCloskey, U.S. Attorney, was on brief, for appellee.

April 5, 2000

**LIPEZ, Circuit Judge**. A federal grand jury in the District of Maine indicted Carlos Esquilin on a charge of possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1).  After the district court denied Esquilin's motion to suppress physical evidence seized in a search of his motel room and statements he made to the police after his arrest, see United States v. Esquilin, 42 F. Supp. 2d 20, 34 (D. Me. 1999), he entered a conditional guilty plea. Esquilin now appeals, challenging the district court's suppression decision on Fourth  Amendment and Miranda grounds. He argues that the court erred in making the following rulings: (1) a dog sniff inside Esquilin's motel room was not a search; (2) his consent to the subsequent search that yielded the cocaine was voluntary; and (3) a prior Miranda violation by the police did not render inadmissible a statement he made to police after Miranda warnings.  We find no error in these rulings and affirm the judgment.

## I.

On September 17, 1998, Esquilin was staying at the Super 8 Motel in Westbrook, Maine.  The motel manager suspected possible drug activity in Esquilin's room because there were a large number of telephone calls and visitors to the room and because Esquilin had re-rented the room in his name and that of

Martin Wright after the room had originally been rented, and paid for in cash, by Wright alone. The manager telephoned Detective Kenneth Viger of the Westbrook Police to explain her suspicions. Knowing that the manager had been a reliable informant regarding drug activity in the past, Viger went to the motel accompanied by Officer Philip Hebert and Hebert's drug-sniffing German shepherd, Zena. In the motel hallway, in response to Hebert's command to find drugs, Zena went to Esquilin's door and sniffed deeply. The officers knocked at the door and Esquilin answered; a smell of marijuana emanated from the room.

Esquilin consented to the officers and the dog entering his room so that Viger could ask him some questions.[1] Viger told Esquilin that he was there to investigate suspected drug activity and asked Esquilin about the reasons for his trip to Maine. Although Viger and Hebert gave conflicting testimony at the suppression hearing about what Hebert and Zena were doing while Viger and Esquilin conversed, the district court accepted Hebert's testimony that Zena was sniffing throughout the motel

---

[1]Esquilin argued before the district court that he did not voluntarily consent, at least to the entry of the dog. The court concluded that "Mr. Esquilin voluntarily consented to the officers and the drug-detection dog entering his motel room," 42 F. Supp. 2d at 29, and Esquilin does not challenge this conclusion on appeal.

room while Hebert held her on a six-foot leash.  See id. at 25. She sniffed at all the furniture, especially the bed, at a GAP shopping bag in the corner of the room, and at Esquilin himself, who patted her playfully and said he had a dog of his own, leading the officers to believe that he was trying to distract her.  Esquilin appeared extremely nervous, his hands were shaking, and he gave evasive replies to Viger's questions.

Believing that Zena had sensed the presence of drugs in the room, Hebert communicated this to Viger by nodding to him.  Viger asked Esquilin if he had any drugs; when Esquilin said he did not, Viger asked if Esquilin minded if they looked around to make sure.  Esquilin responded, "No, go ahead, look anywhere you want."  Hebert gave Zena the command to "find the dope," and she immediately returned to the GAP bag.  After pulling out some clothing, she pulled out a plastic bag containing white powder and, according to Hebert, "threw it in the air, [and it] did the somersault and fell in the middle of the floor."  Viger asked Esquilin what was in the bag.  He answered, "coke."

Esquilin was arrested and Viger went to the manager's office to telephone for backup.  After the arrest, Viger and Hebert neither questioned Esquilin nor gave him Miranda warnings.  Agent Gerard Brady of the Maine Drug Enforcement

Agency arrived and took over the investigation. Viger told Brady that no Miranda warnings had been given to Esquilin. Brady asked Esquilin why he was there and what was going on. Esquilin gestured at the plastic bag and said, "Because of cocaine." In response to questions from Brady, Esquilin said that he was from New York, that the bag contained nine ounces of cocaine, and that the cocaine was his. Esquilin's pager went off, prompting Brady to ask Esquilin if he minded if he looked at the telephone number that was displayed. Esquilin indicated that he did not; when asked he said that the number was his girlfriend's. Brady then read Esquilin the Miranda warnings from a preprinted card. After each warning Esquilin said he understood his rights, and both Brady and Esquilin signed the card. Brady asked if Esquilin wanted to speak to him then, without a lawyer present, and Esquilin answered, "I'll talk to you man to man." He then made a detailed confession, explaining that he had purchased the cocaine in the Bronx for $6,000 and brought it to Maine to sell.

In the district court Esquilin sought suppression of all the physical evidence discovered in the motel room, including the cocaine, some cash that was discovered under a mattress, and a piece of paper found in his clothing. He also sought to suppress all of the statements he made to police

before and after the <u>Miranda</u> warnings. The government did not seek admission of the piece of paper or Esquilin's pre-warning statements to Brady. The court refused to suppress the other evidence, and Esquilin preserved the issue for appeal by entering a conditional guilty plea pursuant to Fed. R. Crim. P. 11(a)(2).

## II.

On appeal, Esquilin first contends that the district court erred by finding that the dog sniff inside the motel room was not a search and that his subsequent consent to search the room was voluntary. Both contentions are without merit.

While Viger was conversing with Esquilin, Zena sniffed around the motel room while held on a six-foot leash by Hebert. The court ruled that this sniffing behavior was not a search, relying on <u>United States</u> v. <u>Place</u>, 462 U.S. 696 (1983). In <u>Place</u>, the Supreme Court held that a dog sniff of luggage in an airport was not a search. <u>See</u> <u>id.</u> at 707. Esquilin argues unpersuasively that <u>Place</u> is distinguishable because the dog sniff there took place in public. On the contrary, the important factor in applying <u>Place</u> is not whether the sniff occurs in a public place like an airport, but whether--as in an officer's "plain view" observation of contraband--"the observing person or the sniffing canine are legally present at their

-6-

vantage when their respective senses are aroused by obviously incriminating evidence." United States v. Reed, 141 F.3d 644, 649 (6th Cir. 1998); see also United States v. Rodriguez-Morales, 929 F.2d 780, 788 (1st Cir. 1991) (holding dog sniff of exterior of car not a search where car was properly impounded). Since Esquilin voluntarily consented to the presence of Zena and the officers in his motel room, the district court correctly concluded that the sniff was not a search.[2]

Esquilin argues further that his consent to the full-blown search of the motel room, in which Zena found and retrieved the cocaine, was not voluntary. We review the district court's finding that Esquilin's consent was voluntary for clear error. See United States v. Coraine, 198 F.3d 306, 308 (1st Cir. 1999). "The voluntariness of a consent to search turns on an assessment of the totality of the circumstances," and "it is not essential that the officers first inform the consenting party of the right to withhold consent." United States v. Barnett, 989 F.2d 546, 554-55 (1st Cir. 1993) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973)).

_____

[2]Esquilin also says that a search occurred when Zena moved various items, particularly the shopping bag, during her initial sniffing around the room. We need not address the legal theory behind this contention, raised for the first time on appeal, because the record is devoid of evidence that Zena moved anything until after Esquilin consented to a full-scale search.

-7-

Esquilin expressly consented to the search, and the evidence amply supports the district court's finding that the consent was voluntary. On appeal, Esquilin points to no facts that suggest a contrary conclusion. So far as the record reveals, his extreme nervousness, rather than the result of any coercive conduct by Viger or Hebert, was merely the natural reaction of a person who has inartfully hidden cocaine in his motel room and is faced with an unexpected visit from two policemen and a drug-sniffing dog. The district court did not err in refusing to suppress the physical evidence discovered in the search.

## III.

Esquilin contends that the district court erred by refusing to suppress the statements he made to Agent Brady after Brady administered the <u>Miranda</u> warnings. The admission of Esquilin's pre-warning statement to Brady was not at issue.[3] Conceding that that statement was obtained in violation of <u>Miranda</u>, the government did not seek to introduce it in evidence.

---

[3]Esquilin does not argue that the statements he made to Viger before he was arrested, including his admission that the plastic bag contained "coke," should have been suppressed pursuant to <u>Miranda</u>.

When a defendant's initial statement is obtained in violation of _Miranda_, the admissibility of a subsequent statement made after _Miranda_ warnings is governed by _Oregon_ v. _Elstad_, 470 U.S. 298 (1985). In _Elstad_, the Supreme Court held that if a statement obtained in violation of _Miranda_ is nevertheless voluntary, a subsequent statement is not subject to the "fruit of the poisonous tree" analysis applicable to a constitutional violation. See _id._ at 309. Instead, "the admissibility of any subsequent statement should turn . . . solely on whether it is knowingly and voluntarily made." _Id._ In deciding the voluntariness of the later statement, a valid waiver of _Miranda_ rights is normally dispositive: "A subsequent administration of _Miranda_ warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." _Id._ at 314. Relying on _Elstad_, the district court concluded that Esquilin's unwarned and warned statements were voluntary and declined to suppress the latter. See 42 F. Supp. 2d at 34.

Esquilin does not argue on appeal that his first statement was involuntary or that the subsequent _Miranda_ warnings he received were deficient. Thus, _Elstad_ would appear to dictate the admissibility of his post-warning statement.

Esquilin nevertheless argues that <u>Elstad</u> is distinguishable because it involved two temporally separate interrogations (about an hour apart, <u>see</u> 470 U.S. at 301), the first unwarned and the second warned, whereas in this case there was only one interrogation, with the warnings occurring mid-stream. In essence, Esquilin contends that the time lapse between the two statements that occurred in <u>Elstad</u> is a necessary part of the case's holding. There is no suggestion of such a limitation in the <u>Elstad</u> opinion, however. The rule of the case sweeps more broadly than its particular facts. Indeed, the Court specifically explained that the factual distinction emphasized by Esquilin is of no legal consequence.

According to <u>Elstad</u>, the lapse of time between interrogations is relevant only when the statement obtained in violation of <u>Miranda</u> was actually coerced. <u>See id.</u> at 310-11. In that event, "the time that passes between confessions" is one factor that bears "on whether that coercion has carried over into the second confession." <u>Id.</u> at 310. On the other hand, when the prior unwarned statement is not coerced, "a careful and thorough administration of <u>Miranda</u> warnings serves to cure the condition that rendered the unwarned statement inadmissible. The warning conveys the relevant information and thereafter the suspect's choice whether to exercise his privilege to remain

-10-

silent should ordinarily be viewed as an 'act of free will.'"
Id. at 310-11 (quoting Wong Sun v. United States, 371 U.S. 471,
486 (1963)).  In other words, although the elapsed time between
interrogations is one factor that may dissipate the taint of a
coerced confession, the lesser taint of a Miranda violation may
be dissipated by subsequent warnings even if the unwarned and
warned statements are obtained during the same interrogation.

Esquilin also argues that his first, unwarned statement
was the product of "improper tactics."  In Elstad, the Court
observed that "absent deliberately coercive or improper tactics
in obtaining the initial statement, the mere fact that a suspect
has made an unwarned admission does not warrant a presumption of
compulsion"[4] as to the subsequent statement.  Id. at 314.

_____

[4]The Elstad Court used the term "presumption of compulsion"
(and, equivalently, "presumption of coercion") in two distinct
ways.  When a statement is obtained in violation of Miranda
there arises a presumption of compulsion as to that statement.
See 470 U.S. at 304-07.  This presumption is "irrebuttable for
purposes of the prosecution's case in chief," id. at 307, making
the statement inadmissible regardless of whether it was actually
compelled.  A presumption of compulsion as to a subsequent
statement does not arise, however, unless the initial statement
was actually compelled.  See id. at 314, 318.  The latter
presumption is substantially identical to the "fruit of the
poisonous tree" rule.  Just as the government can "purge" the
"taint" of an unreasonable search or seizure by showing "a
sufficient break in events to undermine the inference that the
confession was caused by the Fourth Amendment violation," id. at
306, so it can rebut the presumption of compulsion by
demonstrating that the "coercion has [not] carried over into the
second confession," id. at 310.

Esquilin contends that Brady was guilty of more than a "simple failure to administer the warnings," id. at 309, because his conduct was deliberate.[5]  A deliberate Miranda violation, he says, constitutes per se "improper tactics" and automatically warrants a presumption of compulsion as to the subsequent statement, without regard to the effect of the violation on the voluntariness of the initial statement.

This argument focuses on some admittedly imprecise language in Elstad while ignoring the Court's emphasis on voluntariness throughout the opinion.  Although the Court did not explicitly define "deliberately coercive or improper tactics," it used several more detailed phrases that in context are synonymous with that term: "actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will," id. at 309; "physical violence or other deliberate means calculated to break the suspect's will," id. at 312; and "inherently coercive police tactics or methods offensive to due process that render the initial admission

_____

[5]The district court did not make a finding that Brady's Miranda violation was deliberate.  Instead, the court stated that "to the extent [Brady's] conduct is a deliberate or an oft-repeated strategy, it is an unwise one."  42 F. Supp. 2d at 33 n.5.  The court's discussion suggests that it may have assumed arguendo that the Miranda violation was deliberate, see id. at 33, and we will do the same in evaluating Esquilin's arguments on appeal.

involuntary and undermine the suspect's will to invoke his rights once they are read to him," id. at 317. Contrary to Esquilin's argument that there are "improper tactics" that can raise a presumption of compulsion without regard to voluntariness, the Elstad Court held that "there is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of Miranda, was voluntary." Id. at 318. If we read Elstad as a coherent whole, it follows that "deliberately coercive or improper tactics" are not two distinct categories, as Esquilin would have it, but simply alternative descriptions of the type of police conduct that may render a suspect's initial, unwarned statement involuntary.

Esquilin cites no cases adopting a contrary interpretation of "improper tactics." His broader contention that a deliberate failure to give Miranda warnings can mandate the suppression of a post-warning confession despite the voluntariness of both statements is supported by language in one circuit case, United States v. Carter, 884 F.2d 368, 372-74 (8th Cir. 1989). The passage in Carter that Esquilin relies on, however, appears to be dicta. See id. at 374 (stating that confession would be suppressed as fruit of an unconstitutional search even if suppression not required by Elstad). Furthermore,

<u>Carter</u>'s assertion that the admissibility of a post-warning confession following a <u>Miranda</u> violation is not necessarily determined by whether the two statements were voluntary, <u>see</u> <u>id.</u> (criticizing "endless case-by-case voluntariness inquiries"), is facially inconsistent with the Supreme Court's holding in <u>Elstad</u>.

Esquilin does not contend that Brady's allegedly deliberate <u>Miranda</u> violation made his first statement involuntary, and he could not reasonably do so. It is part and parcel of the <u>Elstad</u> holding that a failure to give <u>Miranda</u> warnings does not, without more, make a confession involuntary. <u>See</u> <u>Elstad</u>, 470 U.S. at 306 n.1. The addition of a subjective intent by the officer to violate <u>Miranda</u>, unaccompanied by any coercive <u>conduct</u>, cannot in itself undermine the suspect's free will. In the absence of any police coercion, there was nothing to hinder Esquilin from invoking his right to remain silent after the <u>Miranda</u> warnings were administered, except perhaps his own sense that the initial statement (and the discovery of the cocaine) had "let the cat out of the bag," so that he might as well confess. The <u>Elstad</u> Court, however, said that this sort of effect does not qualify as coercion: "This Court has never held that the psychological impact of voluntary disclosure of a guilty secret qualifies as state compulsion or compromises the

-14-

voluntariness of a subsequent informed waiver." Id. at 312; see also Colorado v. Connelly, 479 U.S. 157, 167 (1986) (holding that confession cannot be involuntary for due process purposes absent "coercive police activity").

Finally, Esquilin suggests that the deterrence rationale of the Miranda rule would be undercut if a deliberate violation by Brady did not result in the suppression of Esquilin's confession, even going so far as to claim that "Elstad could not apply to the present situation without implicitly overruling Miranda." We disagree. Although Elstad does not permit suppression of Esquilin's voluntary statement made after he was informed of his Miranda rights and voluntarily waived them, the basic Miranda rule still operates here to render Esquilin's initial, unwarned (but voluntary) statement inadmissible. The Supreme Court has judged that Miranda's deterrence rationale requires no more than that, see Elstad, 470 U.S. at 308, and we are not free to ignore that judgment.

The district court carefully considered these issues and correctly determined that Esquilin's unwarned admissions to Brady were not rendered involuntary by "deliberately coercive or improper tactics." Because Brady's "careful and thorough administration of Miranda warnings serve[d] to cure the condition that rendered the unwarned statement inadmissible,"

id. at 311, the court was also correct to conclude that Esquilin's subsequent confession was voluntary. The court did not err in denying the motion to suppress the post-warning statements.

**Affirmed**.